(No. 6071.   October 16, 1933.)

OREGON SHORT LINE RAILROAD COMPANY, a Corporation, Applicant, v. EMMITT PFOST, Commissioner of Law Enforcement of the State of Idaho, Defendant.

[27 Pac. (2d) 877.]

Geo. H. Smith and H. B. Thompson, for Applicant.

Bert H. Miller, Attorney General, and Ariel L. Crowley, Assistant Attorney General, for Defendant.

WERNETTE, J.—This is an application for a writ of mandate, to require the Commissioner of Law Enforcement of the State of Idaho to approve the applicant's claim for

refund of the excise gasoline tax paid by it, under protest, to the state pursuant to the provisions of section 18, chapter 46, Laws of 1933.

The applicant, Oregon Short Line Railroad Corporation, is operating as a common carrier, with its main line extending across the southern part of the state in an easterly and westerly direction. It also owns and operates a number of branch lines in the south part of the state. Prior to the year 1933 it was never called upon, nor did it pay any excise tax on motor fuels under the laws in effect in the state of Idaho, for which chapter 46, Laws of 1933, entitled "An Act Imposing an Excise Tax on Motor Fuels," etc., was substituted. After the law of chapter 46, Laws of 1933, became effective demand was made upon applicant by Emmitt Pfost, Commissioner of Law Enforcement for the state of Idaho, defendant, to pay to the state the excise tax on motor fuels provided for in chapter 46, Laws of 1933, on all motor fuels used by the railroad company in the propulsion of internal combustion engines on its railroad tracks and right-of-way; such as gasoline electric motor-cars used on the branch lines in the transportation of passengers and express, section motor-cars, signal-men's speeders, etc. The applicant paid, under protest. The applicant then, pursuant to chapter 46, Laws of 1933, presented to the commissioner of law enforcement the necessary affidavit, etc., as required by the act, for a refund of the moneys so paid under protest, which the commissioner of law enforcement declined and refused to approve and deliver to the state board of examiners for allowance. This refusal on the part of the commissioner of law enforcement was based upon the opinion and advice of the attorney general of the state, to the effect that the right-of-way and railroad tracks of the petitioner constituted a public highway of the state of Idaho within the letter, meaning and intent of chapter 46, Laws of 1933, requiring it to pay the excise tax.

No question as to jurisdiction is before us. It is conceded that there is but one question involved, namely: Are rail-

roads public highways within the meaning of the motor fuels tax act, chapter 46, Laws of 1933?

The history of the present law dates back to 1923, at which time the Idaho legislature passed an act known as chapter 172, Laws of 1923, providing for the payment of an excise tax (therein designated as a license tax) on gasoline, to be placed to the credit of the state highway fund for the construction and maintenance of highways maintained by the state. Section 1 of the 1923 act contained definitions of "motor vehicles," "motor fuels" and "dealers." Section 2 required a monthly report by dealers of motor fuel and payment of a license tax of two cents per gallon. Section 4 of the act provided for the payment of the tax monthly to the commissioner of law enforcement, who should promptly turn it over to the state treasurer, which latter officer was required to "place the same to the credit of the state highway fund." To aid and expedite the enforcement of the act it was provided by section 7 that it should be unlawful for any railroad, or other common carrier, or anyone else to make delivery in the state of Idaho of motor fuels to anyone subject to the act without making certain reports to the commissioner of law enforcement. Section 8 of the act provided: "All motor fuels imported into the state by motor vehicle, or other vehicle operating on the public highways, whether such vehicle is, or is not the property of a common carrier, shall be subject to all of the provisions of this act, and the owner of such vehicle shall be responsible," etc. Section 10 provided: "Any person, firm or corporation who shall buy and use any motor fuels as defined in this act for purposes other than the operation of motors, motor vehicles, tractors or other engines . . . ," should be entitled to a refund upon compliance of the necessary procedure outlined therein.

In 1925 the legislature amended sections 2, 3, 9 and 10 of chapter 172, Laws of 1923, by chapter 185, Laws of 1925. And it is worthy of note that one of the objects or purposes of the 1925 act, as stated in the title of the act, is as follows: "Authorizing refunds of tax paid on motor fuels not

used on public highways.'' Section 10, dealing with refunds, as amended and pertinent to the issue, reads: ''For the purpose of operating or propelling stationary gas engines, tractors, motor boats, and aeroplanes, or who shall purchase or use any of such fuel for cleaning or dyeing or other commercial use of the same, except in motor vehicles operated or intended to be operated upon any of the public highways of the State of Idaho . . . . '' The amended act providing that the proceeds of the tax be placed to the credit of the state highway fund, as was originally required by the 1923 act.

Again in 1927 the law was amended by chapter 231, Laws of 1927. The amendments were very inconsequential; there was a slight amendment to section 10 with reference to the time in which applications for refunds were to be filed with the commissioner, and a new section was added providing a special penalty for the filing of a fraudulent claim for refund.

The law as amended in 1929 by chapter 283, Laws of 1929, remained practically the same except that section 4, as amended in 1929, made provision that the tax collected on gasoline sold for and used in aeroplanes should be placed by the state treasurer in the state aeronautics fund.

In 1931 the legislature again amended the law by amending section 4, providing that ten per cent of the tax collected should be placed in a fund to be known as the ''motor fuel refund fund.'' And section 7 relative to reports by anyone making delivery of motor fuel transported by them to points within the state of Idaho, was also amended by different wording, but in substance it remained substantially the same. The law, as amended, is now to be found as chapter 7, title 48, Idaho Code Annotated.

In 1933 the entire law was rewritten by the legislature, enacting chapter 46, Laws of 1933. In the 1933 act the terms ''motor vehicles,'' ''motor fuels'' and ''dealers,'' as used in the act, were defined substantially the same as originally in the 1923 act. The law providing in section 1 that the term ''dealer'' should include any person as therein

defined who "imports motor fuels, as above defined, into the state, or produces, manufactures, compounds, refines, or blends such motor fuels in this state." And it was provided that the term "person" should include "any individual, firm, co-partnership, association, corporation (both private and municipal), or other group or combination acting as a unit, and the plural as well as the singular number, unless the intent to give a more limited meaning is disclosed by the context." The 1933 act further providing that all persons so importing motor fuels as therein defined were required to file a bond and procure a permit, and make regular reports in substantially the same manner as had been required by the previous enactments; that the amount of the tax so collected should be distributed in the following manner: "(a) Such sum or sums as may have been collected as tax on motor fuels sold for or used in aeroplanes shall be placed in the State Aeronautics Fund; (b) An amount equal to twenty percent of the balance of all such sum or sums as may have been collected shall be placed in the State Highway Treasury Note Redemption Fund, under the provisions of Chapter 3 of the Session Laws of 1929, Extraordinary Session; (c) An amount equal to ten percent of the balance of all such sum or sums as may have been collected shall be placed in the Motor Fuels Refund Fund, which is hereby created for the purpose of paying refund of taxes due on purchase of motor fuels made under the provisions of this Act; (d) The remainder of such sum or sums as may have been collected shall be placed to the credit of the State Highway Fund . . . . " It will be noticed that the proceeds of the tax are devoted to the same purposes as theretofore provided by law.

Section 18 of the 1933 act pertains to the refunding of amounts paid, and so far as is necessary to this decision reads as follows:

"Any person who shall buy and use motor fuel for the purposes of operating or propelling stationary gasoline engines, tractors or motor boats, or who shall purchase and use any motor fuel for cleaning or dyeing or other use of

the same, except in motor vehicles operated or intended to be operated upon the public highways of the state, except in air craft, and who shall have paid any excise tax on such motor fuel hereby required to be paid, whether directly to the vendor from whom it was purchased, or indirectly by adding the amount of such excise tax to the price of such motor fuel, shall be entitled to be reimbursed and repaid the amount of such excise tax so paid by him in the following manner and under the following conditions:

"(a) Claimant shall present to the commissioner an affidavit supported by the original receipted invoice or invoices showing purchase. Such affidavit shall be verified by the oath of the claimant and shall state the name of the person from whom purchased, date of purchase, the total amount of such motor fuel purchased, that the motor fuel so purchased has been paid for, and that the same has been used by said claimant otherwise than in motor vehicles operated or intended to be operated upon the public highways within the State of Idaho.

"Upon approval by the commissioner and the State Board of Examiners of such affidavit and supporting invoices, the State Auditor shall draw his warrant upon the State Treasurer for the amount of such claim in favor of such claimant and such claim shall be paid from the 'Motor Fuel Refund Fund': Provided, that applications for reimbursements and repayments as provided herein shall be filed with the commissioner within ninety (90) days from the date of purchase, or not at all . . . . "

In the original act and all of the amendments prior to the 1933 act, there was contained the following provision:

"That in addition to the taxes now provided for by law, each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name, or in the name of others, or in the name of his representative or agents in this state, in the sale of motor fuels herein defined, shall . . . . render a statement . . . . and pay a license tax . . . . "

In the 1933 act the following language is used, in section 10:

"In addition to the taxes now provided for by law, each and every dealer, as defined in this act, shall . . . . render a statement . . . . and pay an excise tax . . . . "

Thereby omitting the provision of the original' act and amendments prior to 1933 with reference to the sale of motor fuels as a prerequisite to the collection of the tax.

By a comparison of chapter 172, Laws of 1923, and chapter 46, Laws of 1933, and the intermediate amendments, it will be observed that in general substance and effect section 2 of the 1923 act corresponds with section 10 of the 1933 law; section 3 of the 1923 act corresponds with section 11 of the 1933 law; section 7 of the 1923 act, relative to reports of railroads and others with regard to delivery of oil in the state to their customers, is carried forward in a slightly different form to section 16 of the 1933 law, but without substantial change. Section 8 of the 1923 act, declaring the owners of all "vehicles operating on the public highways in the transportation of oil into the State of Idaho" to be subject to all of the provisions of the act the same as common carriers, is perpetuated in section 17 of the 1933 law. Also section 10 of the 1923 law, relative to the refund of the license tax, is re-enacted substantially the same in section 18 of the 1933 law.

Section 10, of chapter 172, Laws of 1923, was somewhat ambiguous as to who was entitled to refund under the law, and consequently was clarified by chapter 185, section 4, Laws of 1925, as to who was entitled to refund, and as so revised reads as follows: " . . . . the purpose of operating or propelling stationary gas engines, tractors, motor boats, and aeroplanes, or who shall purchase or use any of such fuel for cleaning or dyeing or other commercial use of the same, except in motor vehicles operated or intended to be operated upon any of the public highways of the State of Idaho . . . . "

The entire case rests on the construction of the 1933 act. Does the term "public highway," as used in the law, em-

brace or include a railroad, such as is owned and operated as a common carrier by the petitioner?

If the language of the act is clear and unambiguous, and thereby includes railroads as public highways, then there is no room for construction and the court must follow the express language of the statute. On the other hand, if there is substantial doubt as to whether or not the legislature intended by the use of the term "public highway" to include a railroad, then it is the duty of the court, from the language used in the act itself and its history, applying the usual rules of statutory construction, to determine what the intent of the legislature actually was.

After a very careful study of the original act, its growth and development, and in its present form, considering the object and purpose for which the law was passed, we find that the language of the act does not include railroads or railways as public highways, and it is manifest that the legislature never intended that a railroad should be included within the term "public highway" so as to require it to pay the excise tax provided thereby.

There are a number of very obvious and persuasive reasons for reaching such conclusion. Section 5, article 11, of the Constitution, reads as follows:

"All railroads shall be public highways, and all railroad, transportation, and express companies shall be common carriers, and subject to legislative control, and the legislature shall have power to regulate and control by law, the rates of charges for the transportation of passengers and freight by such companies or other common carriers, from one point to another in the state . . . . "

Defendant takes the position that by reason of the provision of the Constitution that "all railroads shall be public highways," that the highways mentioned in the act in question, therefore, necessarily included railroads, for the reason that the Constitution of the state is deemed written in every legislative enactment. (*People v. Texas Co.*, 85 Colo. 289, 275 Pac. 896.) And that the policy of the Constitution must always prevail over mere legislative policy.

(*State v. Johnson*, 50 Ida. 363, 296 Pac. 588; *Boise Payette Co. v. School District*, 46 Ida. 403, 268 Pac. 26.)

This court has heretofore held that constitutional provisions should be given a practical and reasonable construction of what was probably in the minds of the framers of the Constitution, rather than a strained and unusual interpretation. In the case of *Grice v. Clearwater Timber Co.*, 20 Ida. 70, 117 Pac. 112, the question arose whether the Clearwater River was a highway within the meaning and intent of section 19, article 3, of the Constitution, which is as follows:

"The legislature shall not pass local or special laws in any of the following enumerated cases: . . . . authorizing the laying out, opening, altering, maintaining, working on, or vacating roads, highways, streets, alleys, town plats, parks, cemeteries or any public grounds not owned by the state."

The legislature passed an act authorizing the construction of dams in the north fork of the Clearwater River, authorizing sluiceways of sufficient width to permit the floating of timber in the form of loose logs, boards, etc., but not in the form of rafts, booms or brails. The direct question was raised as to whether said act was in violation of said constitutional provision. The court quoted with approval the case of *In re Burns*, 155 N. Y. 23, 49 N. E. 246, using the following language:

"The language of the New York Constitution is almost identical with the language above quoted from the constitution of Idaho, the only difference being that the prohibition in the New York Constitution applies only to roads, highways or alleys, whereas in the Idaho constitution it applies to roads, highways, streets, alleys, town plats, parks, cemeteries, or any public grounds not owned by the state. In the Burns case the legislature of New York had declared 'Roaring Brook,' which was a non-navigable stream, to be a public 'highway' and had provided for proceeding to render it navigable for logs. The court in that case held that in a certain sense streams and waterways are highways; that the sea is said to be a great public highway of

nature; that canals and all public rivers and the Great Lakes are highways; that the railroads are highways, and says:

" 'But surely the framers of the constitution did not use the term in any such broad and extensive sense. Manifestly it is there used in a much more limited sense. The term, in its ordinary and popular sense, refers to the country roads under the management and control of the local authorities of the several towns or counties of the state. . . . . The framers of the constitution evidently used the term in its ordinary and popular sense, comprehending only the ordinary roads and highways under the care of local authorities.' "

In the syllabus by the court we further find this language:

"While the word 'highway' in its broadest sense would include navigable rivers and lakes, the framers of the constitution did not use the term in any such broad and extensive sense. That word in its ordinary and popular sense refers to ordinary roads and highways which are under the care of local authorities, and the term as there used has reference to highways opening through the country upon lands for the travel of the public generally."

█ If the framers of the Constitution used the term "highway" in its ordinary sense and not in an extraordinarily comprehensive sense in section 19, article 3, of the Constitution, did they not, in terming railroads public highways in article 11, section 5, of the Constitution, use the expression in the sense in which that term is ordinarily applied to railroads, rather than the theoretical, strained and comprehensive sense contended for by defendant herein? That this court so held in the Grice case is manifest from the language used:

"The word 'highway' is defined by section 850, Rev. St. 1887 (Section 874, Rev. Codes) which was in force long before the adoption of the state Constitution. Said section is as follows:

" 'Highways are roads, streets or alleys, and bridges, laid out or erected by the public, or if laid out or erected by others, dedicated or abandoned to the public.'

"It is contended by counsel for appellant that said provision of the Constitution does not and was not intended to include the floatable or navigable streams of the state. The framers of our Constitution evidently used the word 'highway' in its ordinary and popular sense, and as defined by the laws of our state in force at the time of the adoption of the Constitution. The term 'highway' has been held to comprehend a navigable stream or waterway as well as railroads, tramways, bridges, ferries and canals; in short, every public thoroughfare is a highway. (1 Elliott on Roads and Streets, Sec. 1.)"

It is well established that the term "public highway" has two well and established, distinct meanings, one of which is, as it is commonly and popularly understood by the general public and as it is defined in section 39–101, Idaho Code Annotated. The other is a restricted meaning, in which the term is used only to denote obligations to the public. This distinction is very forcibly set forth in the language used by the court in the case of *Burlington, K. & S. W. R. Co. v. Johnson*, 38 Kan. 142, 16 Pac. 125:

"The principal point in controversy is in respect to the measure of damages to which Johnson, being a homesteader was entitled. The railroad company contends that, because he holds under a homestead entry, and has not yet acquired the full legal title, he is entitled to recover nothing beyond the mere injury done to the improvements which he had placed on the land. We cannot agree with this contention. The claim is based mainly on an act of congress of July 26, 1866, which declares that 'the right of way for the construction of highways over public lands not reserved for public uses is hereby granted.' Rev. St. U. S. 2477. It is argued that railroads are highways within the meaning of this provision, and that the plaintiff took his homestead subject to the right of the railroad to appropriate a right of way over the same without any compensation for any value of the soil or damages otherwise than to his improvements. The term 'highway' used in the section quoted does not, in either its ordinary or strict sense, include railroads.

It is true that in a certain sense a railroad is a public highway to be constructed and operated according to law and subject to public control. It can only be used, however, in a particular manner, and is not open to common use for foot passengers, horse passengers, animals and carriages, as an ordinary highway may be used. In the usual understanding, a highway is one which is common to all people without distinction, and which they may travel over on foot or horseback or in carriages. . . . . A railroad and a common highway are essentially different in regard to construction, control, and use, as well as ownership, and the distinctions are so well understood that a mention of them is unnecessary.

"It is a familiar rule of law that in interpreting statutes, words and phrases are to be taken in the ordinary sense and common acceptation, unless it appears from the context of the act that a different meaning was intended. We discover nothing in the provision in question, or in the subsequent legislation of congress, which indicates that an unusual meaning was attached to the word, or that it included railroads. . . . . "

See, also, *Western Union Tel. Co. v. Pennsylvania R. R. Co.*, 195 U. S. 594, 25 Sup. Ct. 150, 49 L. ed. 332, 1 Ann. Cas. 533; *Heman Construction Co. v. Wabash R. Co.*, 206 Mo. 172, 104 S. W. 67, 121 Am. St. 649, 12 Ann. Cas. 630, 12 L. R. A., N. S., 112. In the Heman case the Missouri court adopted the following very apt language:

"The declaration in the Constitution that railways in this state are 'public highways,' in the connection in which it appears, obviously was not intended to throw them open as thoroughfares for pedestrians. Its object was to lay a foundation for certain kinds of legislative regulation of railways, but not to change the nature of the railroad property, or to divert it from the general purpose for which it was designed. Nor is it in any sense a warrant to use the cars of the railway company without the payment of reasonable tolls and in defiance of the management and regulation of the company. . . . . Neither is the position of de-

fendants true, that, because they are, by the Constitution, 'public highways,' all of their property is exempt from special assessment, just as a public state or county road would be. The railroad of the company is not in this extreme sense the work of the state. The roadbed and the depot grounds are not public property managed by the company as an agent of the state. On the contrary, the company is a private corporation; its stock is the private property of its stockholders, who, as such, own its property. Because its function is to serve the public as a public carrier the state has invested it with the power of eminent domain and reserved to itself the power of visitation and regulation to protect the public so as to secure reasonable fares and tariffs and proper police regulation, but the stockholders, not the state, pay for its property and easements, and it becomes their property."

In 51 C. J. 409 we find the following:

"As to their·purpose which is the transportation of persons and property for general public, railroads may properly be termed public roads or highways, . . . . A railroad is, however, the private and exclusive property of the company by which it is owned, and so it is not a highway in the ordinary sense."

See, also, *Jenkins v. C. & A. R. R. Co.*, 27 Mo. App. 578; *State v. Little River Drainage Dist.*, 269 Mo. 444, 190 S. W. 897; *Pittsburgh, V. & C. Ry. Co. v. Pittsburgh, C. & S. L. R. Co.*,·159 Pa. 331, 48 Atl. 155; *Comer v. State*, 62 Ala. 320; *State v. Johnson*, 61 N. C. 140; *Sun Printing & Pub. Assn. v. City of New York*, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788; *Muncie Electric Light Co. v. Joliff*, 59 Ind. App. 349, 109 N. E. 433; *Pittsburgh, C., C. & St. L. Ry. Co. v. Stickley*, 155 Ind. 312, 58 N. E. 192; *Gilsonite Const. Co. v. St. Louis, I. M. & S. Ry. Co.*, 240 Mo. 650, 144 S. W. 1086.

This court held in the case of *King v. Independent School District*, 46 Ida. 800, 272 Pac. 507, that in construing statutes words shall be given their usual and ordinary mean-

ing. The meaning of the word "highway" as commonly understood by the public is, as defined in section 39–101, Idaho Code Annotated, as follows:

"Highways are roads, streets or alleys, and bridges, laid out or erected by the public, or if laid out or erected by others, dedicated or abandoned to the public."

Very few, if any, people would consider a railroad as a public highway, as the term highway is commonly understood and considered.

Section 39–2110, I. C. A., originally adopted by the 1913 session, provided for the creation of a state highway fund, and the succeeding section provided for the apportionment of the motor vehicles license money for that fund. Section 39–2112, I. C. A., provides that all moneys in the state highway fund, with few exceptions, are appropriated to the purposes of defraying the expenses and debts incurred in carrying out the provisions and purposes of chapter 21. The excise tax levied and collected pursuant to chapter 46, Laws of 1933, being the one in question, is for the purposes of raising money to be used in the construction and maintenance of highways, as they are defined in section 39–101, I. C. A. Certainly none of the money raised by such tax and placed in the state highway fund could or would be used in the construction or maintenance of a railroad, which is constructed and maintained by the railroad company itself, and not from public funds.

This court has held in the case of *Wood v. Independent School District,* 21 Ida. 734, 124 Pac. 780, 783, that "it is a general rule of law that in construing a statute the court should take into consideration the reason for the law,—that is, the object and purpose of the same, and the object and contemplation of the legislative body in enacting the same." Certainly the primary object and purpose of the law as set forth in chapter 46, Laws of 1933, is identical to the law as construed in *Independent School District v. Pfost,* 51 Ida. 240, 4 Pac. (2d) 893, 897, 84 A. L. R. 820. In that case the court said:

"In Idaho the legislature was confronted with this condition. It found a demand for better roads incident to the use of rapid motor-driven vehicles. It found an extensive use of gasoline on its highways in this traffic. Without affecting the legality of that use, it imposed a tax upon the use, and adopted a method of collecting the tax without exacting any license or permit."

And further, at page 898, 4 Pac. (2d), the court said:

"The fundamental justice and policy of the gasoline tax in this state is the requirement that without exemption the burden of maintenance of the highways is placed directly upon those benefited by that maintenance. If exemptions were granted, then this equitable placement of the burden would to that extent be destroyed. To that extent the individuals using the highways as a class would alone pay for a benefit enjoyed by the general public through its agencies."

In other words, the tax should be exacted from those who actually use the highways by operating motor vehicles thereon, for whose particular benefit the same are constructed and maintained. It is through such actual use of motor vehicles on the highways that they are continuously being worn out and destroyed, requiring large sums of money for the purpose of rebuilding and maintaining the same. It cannot be said that the railroad actually uses the highway, as it is commonly contemplated. The railroad company is required to construct and equip its own railroad line and maintain it at its own expense. Only indirectly is it benefited by the public highways throughout the state. And it is only fair to state that had the railroad companies not pioneered the way by constructing their railroad lines throughout this western country for the purpose of developing the same, we doubt whether there would have been much, if any, need for public highways in this state. Most of the state would undoubtedly still be unpopulated, unproductive and mostly covered with sagebrush. But instead this state takes its place among the highly developed states of the Union.

■ This court having heretofore determined the object and purpose to be attained by the act in the case of *Independent School District v. Pfost, supra,* it seems comparatively easy to determine who the legislature intended should be exempt from the tax and entitled to refund under section 18, chapter 46, Laws of 1933. And when the term, " . . . . except in motor vehicles operated or intended to be operated upon the public highways of the state . . . . ," was used in section 18, it was not intended that the term "public highways," so used, was applicable to railroads. We feel that section 18 of the act is the crux to the question involved in this case.

■ Defendant argues strenuously that by reason of the fact that the original act of 1923, and amendments down to 1933, contained the following provision:

"That in addition to the taxes now provided for by law, each and every dealer, as defined in this act, who is now engaged or who may hereafter engage in his own name or in the name of others, or in the name of his representatives or agents in this state, in the sale of motor fuels herein defined, shall . . . . render a statement . . . . and pay a license tax . . . . ,"

and in the 1933 act, as written, the provision with reference to the sale of motor fuels is entirely eliminated to read:

"In addition to the taxes now provided for by law, each and every dealer, as defined in this Act, shall . . . . render a statement . . . . and pay an excise tax . . . . ,"

that thereby, in view of the fact that railroad companies had not been in the business of selling gasoline, it was the intention of the legislature to classify them as dealers and require them to pay a tax which they had not theretofore paid. We do not believe that such was the intention of the legislature. The act must be construed as a whole and from all of its provisions its intent must be ascertained, and it seems clear to us that the legislature did not intend to include railroads as public highways within the terms of the act.

It is to be assumed that the legislators, at the time the 1933 act was passed, were familiar with the holding in the case of *Independent School District v. Pfost, supra,* holding contrary to defendant's position, and had the legislature intended otherwise, that railroads should be considered as public highways, it would have included railroads by express terms so there could not have been any doubt.

In accordance with the views herein expressed a peremptory writ of mandate should issue, as prayed for by petitioner, and it is so ordered.

Budge, C. J., and Givens, Morgan and Holden, JJ., concur.