(Nos. 6904, 6908, 6906, 6910.   July 19, 1941)

NORTHERN PACIFIC RAILWAY COMPANY, a corporation, Appellant, v. SHOSHONE COUNTY, a municipal corporation; GLYNN D. EVANS, county treasurer; ROY O. SMITH, C. Y. GARBER and DANIEL MURPHY, county commissioners; and NATALIE FERGUSON, county superintendent of public instruction, Respondents.

NORTHERN PACIFIC RAILWAY COMPANY, a corporation, Appellant, v. SHOSHONE COUNTY, a municipal corporation; GLYNN D. EVANS, county treasurer; ROY O. SMITH, C. Y. GARBER and DANIEL MURPHY, county commissioners; and NATALIE FERGUSON, county superintendent of public instruction, Respondents.

HENRY A. SCANDRETT, WALTER J. CUMMINGS and GEORGE I. HAIGHT, Trustees of the property of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, a corporation, Appellants, v. SHOSHONE COUNTY, a municipal corporation; GLYNN D. EVANS, county treasurer; ROY O. SMITH, C. Y. GARBER and DANIEL MURPHY, county commissioners; and NATALIE FERGUSON, county superintendent of public instruction, Respondents.

HENRY A. SCANDRETT, WALTER J. CUMMINGS and GEORGE I. HAIGHT, Trustees of the property of CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, a corporation, Appellants, v. SHOSHONE COUNTY, a municipal corporation; GLYNN D. EVANS, county treasurer; ROY O. SMITH, C. Y. GARBER and DANIEL MURPHY, county commissioners; and NATALIE FERGUSON, county superintendent of public instruction, Respondents.

(116 Pac. (2d) 221)

Rehearing denied September 4, 1941.

H. J. Hull, for Appellants Scandrett et al., and Verner R. Clements, for Appellant Northern Pacific Railway Company.

Albert J. Graf, Prosecuting Attorney of Shoshone County, and James A. Wayne, for Respondents.

GIVENS, J.—Four actions separately brought by the respective appellants, consolidated in the trial court and here, sought the return of taxes levied and paid under Section 61-806 b., I. C. A., 1939 S. L. Ch. 124, page 221.[1]

Appellants' first contention is that in the phrase "in those counties within the State of Idaho where property assessed at more than 67% of the total assessed valuation of such counties is situate outside of the boundaries of school districts, . . . " the words "school districts," mean *all* the school districts in the county, or second, at least

[1] Sec. 61-806 b., 1939 S. L. Ch. 124, p. 221: "Upon the same property designated in Section 61-801, and for the same year, in those counties within the State of Idaho where property assessed at more than 67% of the total assessed valuation of such counties is situated outside of the boundaries of school districts, the school population of which districts, as determined by the average daily attendance in all schools of such county, exceeds 51% of the total school population of the county, in addition to the levy provided in Section 61-806, Idaho Code Annotated, as amended by Section 8 of Chapter 205, Idaho Session Laws of 1935, as amended by Section 3 of Chapter 205, Idaho Session Laws of 1937, the board may levy a tax sufficient to provide a county equalization program not in excess of 35 per cent of the state minimum educational program, the proceeds of such tax to be collected and paid into the county school equalization fund which is hereby created; provided, the tax levied under the provisions of this section plus the levy provided in Sections 61-806 Idaho Code Annotated, as amended, shall not exceed ten (10) mills. This section shall not be interpreted to amend or in any way affect the operation of Section 61-806, Idaho Code Annotated, as amended. The declared purpose of this section is to permit but not to require the raising of additional revenues for a county equalization program, in addition to the state minimum education program, in such counties as may elect to take advantage of the provisions of this act."

*all "organized* school districts," while respondents and evidently the trial court, considered the words "school districts" to mean any one or more school districts, organized or unorganized.

Appellants urge the statute should be strictly construed in favor of the taxpayer, citing *People v. Moore,* 1 Ida. 662, and 25 Ruling Case Law, 1092, Sec. 307. See also, Cooley, Taxation, Sec. 503. Even if such rule of construction be not negatived by Sec. 70-102 I. C. A., it is unnecessary to pass upon the point because of the compulsion of other pertinent rules of statutory construction.

Legislative intent is the main lode star of construction. *Empire Copper Co. v. Henderson,* 15 Ida. 635, 99 P. 127; *Swain v. Fritchman,* 21 Ida. 783, 125 P. 319; *Oregon Short Line R. Co. v. Pfost,* 53 Ida. 559, 27 P. (2) 877; *Steinour v. Oakley State Bank,* 32 Ida. 91, 177 P. 843; *Turner v. Roseberry Irr. Dist.* 33 Ida. 746, 198 P. 465; *State v. Armstrong,* 38 Ida. 493, 225 P. 491; *Gallafent v. Tucker,* 48 Ida. 240, 281 P. 375; *State v. Holder,* 49 Ida. 514, 290 P. 387, 82 A. L. R. 348n.

A statute should be so construed as to give it effect. *Hartman v. Meier,* 39 Ida. 261, 227 P. 25; *State v. Brassfield,* 40 Ida. 203, 232 P. 1; *Ryan v. Old Veteran Mining Co.,* 35 Ida. 637, 207 P. 1076; *Sharp v. Brown,* 38 Ida. 136, 221 P. 139; *Hunt v. City of St. Maries,* 44 Ida. 700, 260 P. 155; *Diefendorf v. Gallet,* 51 Ida. 619, 10 P. (2) 307, 97 A. L. R. 1489n.

If appellants' first interpretation were adopted the statute would be wholly ineffective because there is no county where any taxable property lies outside of *all* school districts, because all the property in a county is in organized[2] or unorganized[3] school districts, hence there

---

[2] Section 32-301 I. C. A.: "The following kinds of school districts within the state of Idaho shall be established and are hereby recognized and conferred ranking in inverse order as herein named:
    1.   Common school districts.
    2.   Joint common school districts.
    3.   Rural high school districts.
    4.   Joint rural high school districts.
    5.   Independent school districts.
    6.   Joint independent school districts.

never could be 67 per cent or any other per cent of the total assessed valuation of such counties outside the boundaries of school districts.

The plural includes the singular. Sec. 70-114 I. C. A.

Since the phrase clearly does not mean *all* school districts it perforce means any number less than all, which may therefore be one or more which contain 51 per cent plus of the school population in the county and less than 67 per cent of the assessed valuation, and there is nothing to indicate the legislature intended to differentiate between all "organized districts" or any number thereof less than all. That no limitation was made clearly evidences the intention to make the determination rest on any number having sufficient school population and less than 67 per cent of the assessed valuation.

Appellants' second point is that the record does not disclose the county commissioners and the county superintendent of schools took the claimed necessary preliminary and asserted jurisdictional steps enumerated in Sec. 61-806 c, 1939 S. L. 222.[4]

---

7. Independent school districts class A.
8. Joint independent school districts class A."

[3] Section 32-401 I. C. A.: "For the purpose of further carrying out the requirements of section 1 of article 9 of the constitution of the state of Idaho, there is hereby created, in each county of the state having territory not included within the boundaries of any organized school district, a district to be known as 'Unorganized School District of ............ County,' embracing all such territory within the county as is not included within the boundaries of any organized school district."

[4] Sec. 61-806 c., 1939 S. L. 222: "At its first regular meeting in March each year the board of county commissioners shall determine upon the county equalization program, if any, that shall be authorized for the next school year as provided in Section 61-806 a, Idaho Code Annotated, and shall immediately inform the county superintendent as to the amount of money per classroom unit month to be provided for the schools of the county during the next year. On or before the third Monday in March the county superintendent shall notify the clerk of the school board of each school district in the county as to the amount of money per classroom unit month the county equalization program will provide for such district during the next school year. For the purpose of this act, high school classroom units shall be counted as one and one-third (1⅓) classroom units. The county superintendent shall furnish

The statute does not require such steps be made a matter of record, and if the underlying facts justifying such steps exist the mere performance of the steps would be directory, not mandatory. *In re Overland Co. v. Utter*, 44 Ida. 385, 257 P. 480; *Standolind Pipe Line Co. v. Tulsa County Excise Board* (Okl.) 80 P. (2) 316; *School Board etc. v. Rupp*, (Kan) 106 P. (2) 669. It is the existence of such jurisdictional facts which controls. *Standolind Pipe Line Co. v. Excise Board of Lincoln County*, (Okl) 93 P.(2) 1085. The complaints do not allege, (except as to the contention as to the words "school districts," disposed of supra) that the facts did not exist, but merely that the county commissioners and the county school superintendent did not make the determination and give the notifications specified in the statute. Appellants do not show in regard to the recovery of *this tax* how the failure to perform these acts has injured them.

The cases cited by appellants are all distinguishable; thus *Bramwell v. Guheen*, 3 Ida. 347, 29 P. 110, required an election, which the court determined was not held. In *Oregon Short Line R. Co. v. Minidoka County*, 31 Ida. 719, 175 P. 962, there was a lack of statutory authority; *Oregon Short Line R. Co. v. Gooding County*, 33 Ida. 452, 196

to the board of county commissioners such information as may be required for the purposes of this act."

Sec. 61-806 a, 1939 S. L. 137: "Annually, on or before September 15, the county superintendent shall determine the number of new class room units in the school districts of his county not included in his last annual report, the amount of money required, when added to the proceeds of the minimum district levies provided in Section 32-702, Idaho Code Annotated, as amended by Section 12, Chapter 205, Idaho Session Laws of 1933 as amended by Chapter 84, Idaho Session Laws of 1935 and Section 32-704, Idaho Code Annotated, as amended by Section 13 of Chapter 205, Idaho Session Laws of 1933, to provide the minimum educational program defined in Section 32-805, Idaho Code Annotated, as amended by Section 4 of Chapter 205, Idaho Session Laws of 1933, as amended by Section 1 of Chapter 205, Idaho Session Laws of 1937. The county superintendent shall report to the board of county commissioners the added amount of money so determined, and upon the same property designated in Section 61-806 and for the same year the board shall levy a tax sufficient to provide such amount, to be collected and paid into the county school emergency fund which is hereby created."

P. 196, lack of supporting factual premise, not failure to show such had not been preliminarily determined. *Petrie v. Common School Dist. No. 5,* 38 Ida. 583, 223 P. 535, the essential steps which were lacking involved substantive participative action by members of the school district, not procedural as herein.

Judgment affirmed.

Costs to respondents.

MORGAN, J. concurs.

BUDGE, C.J., concurring specially.—Sec. 61-806-b, I. C. A. provides: "The declared purpose of this section is to permit but not to require the raising of additional revenues for a county equalization program, in addition to the state minimum education program, in such counties as may elect to take advantage of the provisions of this act." In other words, the purpose of this statute is to "equalize" the burden of educating the children; its purpose is uniformity.

In order to reach this uniformity throughout the county the legislature further provided that a tax may be levied upon the taxable property within the county "where property assessed at more than 67% of the total assessed valuation of such counties is situate outside of the boundaries of school districts, the school population of which districts, * * * * exceeds 51% of the total school population of the county." From the above quotation it is readily apparent that the legislature intended that the statute should apply only in a certain exigency.

As Justice Givens points out the respondents contend that the words "school districts" in the above statute mean one or more organized or/and unorganized school districts. On the other hand appellants contend that the words "school districts" mean only organized districts; or that the statute should apply only when 51% of the school children and less than 33% of the wealth are in the organized districts. Under respondents' theory the statute would apply in the above situation but also in

many more where the burden of taxation would otherwise be unevenly distributed. This can best be shown by a few illustrations.

Suppose that a certain county has 24 school districts (both organized and unorganized) and that they are designated by letters starting with "A" and ending with "X." Now, suppose that in school district "A" we have 51% or more of the school children but less than 33% of the wealth. In such an instance the county board could take advantage of the equalization statute, if respondents' theory is upheld, whether or not the rest of the districts were organized or unorganized. Appellants' theory would apply only if all of the organized districts taken together had 51% or more of the children and less than 33% of the wealth. If the purpose of the statute is to equalize the burden of taxation why not let the statute equalize the burden whenever it is out of proportion, and not just in a certain instance.

Suppose that in this same county, school district "X" has 90% of the wealth and only 2% of the school children. If school district "X" were an organized district then under appellants' theory, the County Board could not take advantage of the equalization levy, and, figuratively speaking, school district "X" would have 90 cents to educate 2 children, whereas the other 23 school districts would have 10 cents to educate 98 children.

In other words, if appellants' theory is correct, an organized district with 67% (or more) of the wealth and less than 49% of the children would be paying considerably less in proportion than all of the other districts in the county, even though the other districts had less than one-third of the wealth of the county, and more than half of the school children. While if the tax is spread over all of the wealth in both organized and unorganized districts (which is respondents' theory), there would be an equal and uniform distribution of the tax.

The judgment should be affirmed.

AILSHIE, J., dissenting—The judgment in this case should be reversed and the cause remanded, with directions to the district court to overrule the demurrer and

require the defendant to answer. The material and essential part of sec. 61-806-b, I. C. A. (1939 Sess. Laws, chap. 124, p. 221) reads as follows:

"Upon the same property designated in Section 61-801, and for the same year, in those counties within the State of Idaho where property assessed at more than 67% of the total assessed valuation of such counties is situate outside of the boundaries of school districts, the school population of which districts, as determined by the average daily attendance in all schools of such county, exceeds 51% of the total school population of the county, in addition to the levy provided in Section 61-806 .... the board may levy a tax sufficient to provide a county equalization program....."

It seems clear to me that the "school districts," referred to and mentioned in sec. 61-806-b ('39 Sess. Laws, chap. 124) means, and is referring to, *organized districts* as defined in sec. 32-301, I. C. A. I do not see how it is possible to reach the conclusion that the legislature intended to include *unorganized* districts within the meaning of the terms "school districts." In other words, the legislature was attempting to provide that, where more than 67% of the total assessed valuation of a county is within *unorganized* territory, and at least 51% of the total school population attendance is *within organized* districts, then the provisions of this section become applicable; and the additional levy may be made *on all the taxable property within the county*.

Certainly, the legislature could not have intended to attach to the words "school districts" a different meaning in one part of this section from that intended to apply in another part of the same section. Therefore, if the "property assessed at more than 67% of the total assessed valuation of such counties is situate outside of the boundaries of school districts," and, at the same time, it was intended to embrace unorganized districts within the term "school districts," then there would be no territory "outside of the boundaries of school districts." For the same reason, it would have been wholly unnecessary and superfluous to use the words "exceeds 51% of the total school population of the county," if "school districts" in-

clude both organized and unorganized territory, for the reason there would (under such construction) be 100% of the total attendance within the districts.

Justice Holden authorizes me to say that he concurs in this dissent.