229 P.2d 991

NAMPA LODGE NO. 1389 OF BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF UNITED STATES OF AMERICA et al. v. SMYLIE, Atty. Gen., et al.

No. 7712.

Supreme Court of Idaho.

April 2, 1951.

Robert E. Smylie, Atty. Gen., William H. Bakes, Blaine F. Evans, Asst. Attys. Gen., W. W. Wander, Pros. Atty., Caldwell, for appellants.

Earl E. Garrity, Van de Steeg & Schiller, Nampa, Richards, Haga & Eberle, Boise, for respondents.

THOMAS, Justice.

The commissioner of law enforcement of the state of Idaho, the city of Nampa and Canyon County each issued an annual retail liquor license to each plaintiff for the retail sale of liquor by the drink in Nampa, Idaho for a period beginning January 1, 1950 and expiring at midnight on the 31st day of December, 1950. Each plaintiff did engage in the retail sale of liquor by the drink in Nampa under such licenses during the year 1950 up to and including March 14, 1950.

On March 14, 1950 a local option election was held in Nampa pursuant to the provisions of Title 23, Chapter 9 of the Idaho Code, at which election there was submitted to the voters as provided by statute the following questions:

"Sale of liquor by the drink — Yes —

"Sale of liquor by the drink — No —".

At such election a majority of the voters voted in the negative.

Each plaintiff ceased the sale of liquor by the drink in the city of Nampa subsequent to the said local option election and commenced an action on April 12, 1950 under the declaratory judgments act, I.C. § 10–1201 et seq., wherein they sought to have the court declare and determine their rights under such retail licenses for the year 1950.

The respondents contended that the election did not operate to revoke outstanding licenses and that any such licenses remained in full force and effect to the date of expiration which was midnight December 31, 1950; appellant contends that such licenses were ipso facto revoked as a result of such negative local option election, and that the respondents could not legally sell liquor by the drink after such election was held.

The court below entered a judgment to the effect that the negative vote did not operate to revoke the licenses of the respondents prior to the expiration date of such licenses and that the only effect of such election was to terminate the right of the commissioner of law enforcement under the act to issue further licenses and that the sale of liquor by the drink within the city of Nampa to the end of the year 1950 under such licenses was not unlawful.

A liquor license is simply the grant or permission under governmental authority to the licensee to engage in the business of selling liquor. Such a license is a temporary permit to do that which would otherwise be unlawful; it is a privilege rather than a natural right and is personal to the

licensee; it is neither a right of property nor a contract, or a contract right. Roberts v. Boise City, 23 Idaho 716, 132 P. 306, 45 L.R.A.,N.S., 593; O'Connor v. City of Moscow, 69 Idaho 37, 202 P.2d 401; In re Suspension of License by Oregon Liquor Control Commission, 180 Or. 495, 177 P.2d 406; 48 C.J.S., Intoxicating Liquors, § 99, p. 223 and § 109 p. 227; 30 Am.Jur. Sec. 189, p. 353.

A license to sell intoxicating liquors in a municipality is also subject to the authority vested in such municipality by statute to prohibit the sale of intoxicating liquors within its boundaries under local option statutes; thus one who procures a state, county and city or village license takes it subject to the provisions of the statute under which the license is granted. Gale v. City of Moscow, 15 Idaho 332, 97 P. 828.

After such enactment a license or permission granted before the adoption of the law is no protection to one who makes a sale after the local option law becomes effective; however, if a local option statute contains a provision saving rights such statute will be construed to include licenses previously issued to sell intoxicating liquor. The licensee cannot be heard to complain of the revocation of his license as divesting him of any right for the reason that the licensee, by accepting the license, thereby assents to all the conditions of that act; his acceptance of the liquor license carries with it the implication of an agreement with the issuing authority that it may, pursuant to the terms of the act, exercise its power of revocation in accordance with the act under which the privilege was granted; moreover, as a general proposition, a license to sell liquor is revoked or annulled by repeal of the law authorizing the grant of such license. 48 C.J.S., Intoxicating Liquors, § 176, p. 287; see also 48 C.J.S., Intoxicating Liquors, § 64, p. 199; or by change in policy or in legislation, where any such change is inconsistent with the further exercise of the privilege conferred by the license. Such change in policy embraces an election under a local option law. 48 C.J.S., Intoxicating Liquors, § 174(b), pp. 277, 278.

Under the act which became effective on March 19, 1947, the commissioner of law enforcement was empowered to issue an annual state license to a qualified applicant for the sale of liquor by the drink at retail in a particular municipality. The amount of such annual license is determined on a population basis; the annual license fee exacted by the county shall not exceed twenty-five percent of the state license and the annual license fee exacted by a city or incorporated village shall not exceed seventy-five percent of the state license. Secs. 23–904 and 23–916, Idaho Code.

There is no provision in the act for issuance of a license for less than one year except the licenses for the year 1947. No licenses could be issued until or after July

1, 1947, and all licenses expire at midnight on December 31st of the calendar year in which issued. Secs. 23–903, 23–904 and 23–909, Idaho Code.

Within sixty days after the effective date of the act, that is, March 19, 1947, a petition might be filed with the clerk of the city or village by the requisite percentage of the qualified electors of the city or village as their protest against the issuance of any license within the city or village; if such a petition is in due form the governing authority shall call an election. Sec. 23–917, Idaho Code.

The time elapsing between the effective date of the act and the time when the first licenses might be issued afforded qualified electors in any city or incorporated village the opportunity to protest the issuance of any such licenses within the city or village. It was clearly the intention of the legislature to permit cities and incorporated villages to protest against the issuance of licenses in the first place, otherwise licenses to qualified applicants would issue as of July 1, 1947 for a period ending at midnight on December 31, 1947.

The legislature set forth in Section 23–918, Idaho Code, the form of ballot to be used in any such election in these words:

 " 'Sale of liquor by the drink, Yes,'

 " 'Sale of liquor by the drink, No.' "

The question submitted to the electors made no reference to licenses; however, should the majority express their protest against the issuance of licenses by their vote against the sale of liquor by the drink no sales could legally be had within the particular city or village and hence no licenses would be issued therein. On the other hand, unless such a protest election was held at which the majority voted "No", any city or incorporated village was authorized and empowered to license the sale of liquor by the drink and to impose a license fee not to exceed seventy-five percent of the amount exacted by the commissioner of law enforcement. Sec. 23–916, Idaho Code.

The effect of such an election set forth in Section 23–919, Idaho Code, is as follows: "23–919. Effect of election—Liquor store sales not affected.—Upon a canvass of the votes cast, the clerk of the city or village shall certify the result thereof to the commissioner. If a majority of the votes cast are 'Sale of liquor by the drink, Yes,' licenses shall be issued in said city or village as in this act provided. If a majority of the votes cast are 'Sale of liquor by the drink, No,' then no licenses shall be issued in said city or village unless thereafter authorized by a subsequent election in said city or village; provided, however, that nothing herein contained shall be construed to prevent or prohibit the sale of liquor at or by a state liquor store or state distributor."

While the question submitted in any such election is simply the question of whether or not the sale of liquor by the drink shall

be authorized and not whether or not licenses shall be issued, yet the section provides that upon affirmative vote licenses shall be issued and upon a negative vote no licenses shall issue. At the time of the original election there could be no outstanding licenses subject to revocation or protection or no right to sell except the right of the state through its liquor stores, which was expressly excepted from the act.

Section 23-919, Idaho Code, made reference to subsequent elections which are provided for in Section 23-920, Idaho Code, as follows: "23-920. Subsequent elections. —A similar election may be subsequently called and held upon the issue of whether the sale of liquor by the drink shall be prohibited or, if prohibited, then an election to determine whether the sale of liquor by the drink shall be licensed. Such subsequent election shall be held upon the filing of a petition, as provided in section 23-917, signed by the requisite percentage of qualified electors. No such subsequent election shall be held prior to November 1, 1949, or oftener than two years after the holding of any such subsequent election."

Under the section last above designated, no election other than one held within sixty days of the effective date of the act, could be held prior to November 1, 1949 or oftener than two years after the date of any subsequent election. At a subsequent election the issue presented to the voters is whether or not the sale of liquor by the drink shall be prohibited or whether or not

the sale of liquor by the drink shall be licensed, as the case may be. If, at the time of any subsequent election within a municipality, the sale is licensed, as it was in Nampa when the election was held, then if a majority of the votes cast are against the sale of liquor by the drink, such sale would be prohibited. This leaves only the question of when the sale would be prohibited, that is, immediately following the election, or at midnight on December 31st of the year in which the election is held.

Unless the act, construed as a whole, discloses a legislative intent to leave outstanding licenses undisturbed to the end of the license period following a local option election in which a majority voted in the negative, then such an election automatically operates to revoke such licenses.

The primary rule with reference to the interpretation of statutes where any ambiguity exists, is to ascertain and give effect to legislative intent. Northern Pac. Ry. Co. v. Shoshone County, 63 Idaho 36, 116 P.2d 221. The act should be construed in its entirety and as a whole for the purpose of ascertaining the legislative intent, and where different sections reflect light upon each other they are regarded as in pari materia. Ingard v. Barker, 27 Idaho 124, 147 P. 293; 50 Am.Jur. Sec. 352, p. 350.

Furthermore, it is proper in construing a statute to look to the origin of the statute or the sections as well as the sources from which they were derived.

50 Am.Jur. Sec. 339, p. 331. Moreover, it is generally presumed that the legislature in the enactment of a statute consulted earlier acts on the same subject matter and this is so even though the earlier statutes have expired or have been repealed. 50 Am.Jur. Sec. 354, p. 356.

As early as 1909 Idaho enacted a local option statute, 1909 Session Laws, Senate Bill 62, p. 9. At that time the sale of liquor throughout the state was licensed. That act, as the act now under consideration, provided for a local option election to determine if the sale and disposal of intoxicating liquors should be prohibited. It also provided that if a majority of the votes cast at such election should be in favor of prohibition, thereafter it would be unlawful for the board of county commissioners to grant licenses to sell and dispose of intoxicating liquors within the county until and unless at a subsequent election a majority of the votes cast thereat were against prohibiting the sale of liquor. The act of 1909 further expressly provided that if a majority of the voters favored prohibition all licenses for the sale of liquor granted after the passage of the act should become on a day certain of no force and validity and that the holder of any such license would become liable for the sale of liquor made by him the same as though no license had been issued. It further provided for a refund of the unused portion of such licenses and that licenses issued before the passage of such act should not in any manner be terminated by the act or by any election held thereunder.

The legislature of 1909 treated a license issued prior to the effective date of the act and a license issued after the effective date of the act differently. The present act is silent as to the effect on licenses issued after the effective date of the local option law. There were no licenses issued prior to the effective date of the act, hence no need for treatment or distinction between licenses issued prior to and after the effective date of the act as found in the act of 1909. Even though it is presumed that the legislature consulted the act of 1909, it did not provide, as the legislature of 1909 did provide, that outstanding licenses shall become void on a date certain after a referendum election at which election a majority voted for prohibition. There must have been some reasons for the policy of the legislature of 1947 to treat this matter differently than it was treated by the legislature of 1909.

The time when a local option law shall go into effect is for the legislature and the power to enact such law carries with it the power to fix the time when licenses shall cease where the vote is against the sale. 48 C.J.S., Intoxicating Liquors, § 66, p. 199.

The act of 1909 was specific as to the time when the local option law should go into effect as well as the effect of such local option law on outstanding licenses, whether issued before or after the enact-

ment of the statute; it specifically provided for refund of unearned portions of licenses terminated by a local option election. It was specific and explicit with reference to the liability of a license who sold liquor after the effective date of the local option law. On the other hand, the present act as to licenses, only provides that no licenses shall issue following such local option election unless thereafter authorized by a subsequent election. These differences are significant in the light of the well recognized pronouncement that the legislature consulted the act of 1909 when the act of 1947 was drafted. Both statutes dealt with the same general subject and moved toward the same ultimate objective. The failure of the legislature of 1947 to provide when local option should become effective or when outstanding licenses and the rights thereunder would be voided, or what liability, if any, the holder of a license subjected himself to where liquor was sold by such licensee after the local option election was held, reveals intentional change of policy, not only with reference to the effective date of the local option law, but also with reference to its effect on outstanding licenses.

Licenses except for the year 1947 can only be purchased on a yearly basis; the license fees are substantial; referendum elections cannot be held more than once in every two years on and after November 1, 1949 in addition to the election which might have been held to protest the issuance of licenses in the first instance if such elec-

tion was held prior to July 1, 1947. Many of these features were favorable to licensees under the act; their presence and the absence of other provisions found in the act of 1909 is strong indication that the legislature because of the substantial fees exacted, among other reasons, intended that the holders of such licenses should be protected against the risks of losing a license unless the licensee was at fault, before the end of the licensing year.

If it were the intent of the legislature to void and terminate all outstanding licenses as of the date of any such negative election, it is reasonable to expect that it would have so expressly provided and that it would also have made provision for refund of the unearned portion of the outstanding licenses.

 Although as a general rule a license tax voluntarily paid cannot be recovered back in the absence of statutes so authorizing it, however, this rule is subject to an exception that where a license granted by a municipality becomes inoperative by the act of the municipality or by operation of law, rather than by fault of the licensee, such licensee may recover the unearned portion of the license fees. Roberts v. Boise City, 23 Idaho 716, 132 P. 306, 45 L.R.A., N.S., 593.

That the legislature did not intend that any refund should be made is obvious, and it is equally obvious that this was not necessary because it was the intention of the legislature that outstanding licenses would

be effective to the end of the licensing period except where licensee violates the act; in this way the administration of the fiscal policies of the municipality would not be endangered through refunding of moneys already apportioned or encumbered; equally important, the municipality would be observing the same rules of honesty and fair dealing that are expected and demanded under like circumstances from the individual. Roberts v. Boise City, supra.

That this was the apparent legislative intention is further manifested when it provided as concerning the protest election that if a majority of the voters voted in the affirmative licenses shall issue and if in the negative no licenses should issue, Sec. 23–919, Idaho Code, and then the legislature, speaking of subsequent elections, Sec. 23–920, Idaho Code, provided that a similar election may be subsequently called and held upon the issue of whether the sale shall be prohibited or licensed; the word "similar" in its primary sense sometimes means exactly corresponding to or exactly alike. At other times it means somewhat like, or having a general likeness. 6 Words and Phrases, p. 304. It was the intention of the legislature to make the subsequent election as nearly as practicable the same as the protest election; if the vote in the protest election was negative no licenses should issue and if the vote in any subsequent election was negative no licenses should issue thereafter.

We hold that the legislature did not intend that a negative local option election operates to void any outstanding licenses prior to their expiration date, but only that no licenses could issue after any such local option election except where sanctioned by a majority vote at a later election.

Judgment is affirmed.

GIVENS, C. J., and TAYLOR and KEETON, JJ., concur.

PORTER, Justice (dissenting).

It appears to me that the majority opinion well and correctly states in the abstract the applicable principles of law. However, I conceive that the opinion, in the light of such principles, does not correctly interpret the 1947 local option law.

The opinion recognizes that liquor licenses are automatically terminated by an adverse local option election unless there is a saving clause or an intention to the contrary to be found in the local option law. There is no saving clause in the 1947 act. Let us consider the grounds upon which the opinion concludes that the act, as a whole, expresses the intention that outstanding liquor licenses should not be terminated by an adverse election.

It is stated that the 1947 legislature is presumed to have considered and consulted the repealed local option law of 1909. The fact that the 1947 act does not follow the act of 1909, indicates, it is averred, a change of policy. The 1909 act contained

an express saving clause providing that outstanding licenses issued after the passage of the act would expire three months after a negative local option election. Absent such saving clause, licenses would have expired immediately upon such negative election. To me, the fact that the 1947 legislature did not follow the saving clause in the 1909 act, indicates that the legislature intended the outstanding licenses to terminate immediately.

The 1909 act provided for a refund of the unearned portion of the license fees. The 1947 act has no such express provision. The majority opinion cites and paraphrases Roberts v. Boise City, 23 Idaho 716, 132 P. 306, wherein it is stated that where a license granted by a municipality becomes inoperative by the act of the municipality or by operation of law, the licensee may recover the unearned portion of the license fees. Under such authority, the provision in the 1909 act for the refund of the unearned portion of the license fees, did not add anything to the rights of licensees under the act. The absence of such provision in the 1947 act does not deprive the licensees of their right to recover the unearned portion of their license fees.

The majority opinion states that the license fees are substantial and, "that the legislature did not intend that any refund should be made is obvious." I inquire, what provision in the law makes such conclusion obvious? If the unearned portions of the license fees are recoverable, wherein would the municipality be transgressing "the same

rules of honesty and fair dealing that are expected and demanded under like circumstances from the individual"? It seems to me that the 1947 act more surely violates fair dealing if it be interpreted to mean that the citizens of Nampa were compelled to tolerate the sale of liquor by the drink with its attendant evils for a period of over nine months after they had voted to prohibit such sales.

The fact that the licenses are all made to expire on December 31 of each year, is not peculiar to the 1947 act. Liquor licenses usually are issued on an annual basis.

I do not find anything in the 1947 local option law nor in its analysis in the majority opinion which indicates an intention on the part of the legislature to depart from the general law that liquor licenses automatically expire at the time of an adverse local option election. The judgment of the trial court should be reversed.