(No. 7013. August 18, 1942.)

R. E. PEPPLE and R. L. GRAVES, Appellants, v. DON HEADRICK, Sheriff of Ada County, Idaho; JAMES W. BLAINE, Prosecuting Attorney for Ada County, Idaho; and GEORGE HASKIN, Chief of Police of Boise City, Idaho, Respondents.

[128 Pac. (2d) 757.]

Willis C. Moffatt, Hamer H. Budge and Fred M. Taylor for appellants.

134

Kenneth O'Leary, M. Oliver Koelsch, James W. Blaine and C. Stanley Skiles for respondents.

AILSHIE, J.—This action is brought by appellants for a permanent injunction, to restrain respondents from seizing, confiscating, destroying, or interfering with certain property of appellants, commonly known as "pinball machines." Appellants (plaintiffs) allege ownership of certain ma-

chines, the payment of federal, state and county taxes, and license fees to Boise City, the distribution of the machines to divers persons within the city and county, "to be operated . . . . for the enjoyment of the public"; that they are lawful property and not operated contrary to any state law or city ordinance; that unless respondents are enjoined, appellants will be deprived of their property and livelihood without due process of law.

Application was made to the trial court for a temporary injunction against respondents, restraining them from interfering with these machines and the use thereof. A show cause order thereupon issued. Answer was filed by defendants, admitting seizure, confiscation, and possession of two pinball machines belonging to appellants, but alleging that the machines were maintained in violation of, and are prohibited by, the provisions of title 17, chap. 23, I.C.A., sec. 17-2301 of which is as follows:

"Every person who deals, plays or carries on, opens or causes to be opened, or who conducts, either as owner, employee, or lessee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noir, rondo, Indian stick game, or any game played with cards, dice, or any other device, for money, checks, credit or any other representative of values, is guilty of a misdemeanor and is punishable by fine not less than $200, or imprisonment in the county jail not less than four months."

The machines or devices are described as follows:

"The cabinets of said pinball machines have a flat horizontal top in the shape of a table, mounted upon a base with one end of the table, at a slightly lower elevation than the other.

"The game is played on the top of said table by the use of a plunger which propels a metal ball to the top of said table from which point the ball rolls to the lower end, unless it falls into one of a number of holes in the surface of said table. There are four series of holes numbered from 1 to 7 inclusive, which numbers correspond to numbers lighted on a backboard set above the end of the table.

"The game is played by placing a nickel in a coin slot located on the lower left-hand corner of the table and by pushing the slot forward, a metal ball drops into a receptacle from which receptacle it may be elevated to the play-

ing surface of the board by the player, so that the ball is in a channel which extends the length of the right-hand side of said table and directly in front of the plunger; pushing the coin slot forward also causes one or several numbers of the backboard to light; and the object of the game is then for the player to shoot the metal ball into one of the holes on the table which corresponds with a number or numbers which may be lighted on the backboard. Pushing the coin slot forward also indicates the odds which the player will receive in the event he is successful in shooting the ball into a proper hole. The ball is shot by pulling the plunger back along a scale, marked by degrees, and then releasing the plunger. The distance from the ball at which the plunger is released determines the speed which the ball will have when propelled from the channel onto the playing surface on the table. In addition to the holes on said table, there are metal springs and pins at various places between the holes. If the player is successful in lodging the ball in a hole which corresponds to one of the numbers lighted on the backboard, the machine automatically returns to him the number of nickles shown in the list of odds on the backboard, and if not successful in lodging the ball in one of the said holes he receives nothing."

Respondents prayed that the machines be adjudged gambling devices; that a restraining order be denied and the cause dismissed.

January 7, 1942, the matter came on for hearing before the court on demurrer to the answer. January 19, 1942, the trial judge rendered his decision and entered an order, holding, *inter alia*, as follows:

"The fact that games change in name and style, that inventive genius creates new devices and new forms of games which the legislators who framed the gambling statute never saw and probably never anticipated, does not change the law.

"Our gambling statute strictly construed under the rule of construction of criminal statutes is broad enough to cover a pin ball machine if this 'device,' 'invention,' 'contrivance,' or 'machine' is used for gambling or gaming purposes. Under any other construction the law would be a farce and the prohibition of the law constantly thwarted by some new game, new invention, or new device.

"In my opinion the pinball machine described in the

answer, with a pay-off in coins, comes within the purview of our gambling statute."

Thereupon counsel for appellants made a formal motion for a restraining order against the defendants, which motion was denied; and an order was entered accordingly, from which this appeal is taken.

The question to be answered now is: Was the pinball machine, maintained and operated as above stated, a violation of the anti-gambling statute, sec. 17-2301, supra?

It is argued by appellants, that, since the legislature saw fit to enumerate a number of prohibited games and some devices upon which it placed disapproval, the additional words, "or any other device," were intended only to prohibit any other device "of a like kind or nature to those enumerated." This necessarily narrows our inquiry to the language and intent of the legislature in the adoption of sec. 17-2301. The history of the legislation, both territorial and state, in dealing with the subject of gambling, affords us very little assistance in the solution of our present problem, other than to confirm the knowledge that our early legislation was chiefly regulatory and not prohibitive. We append a footnote showing the development of the anti-gambling law in Idaho.[1]

[1]January 13, 1871, the territorial legislature (Sixth Legislative Assembly) enacted the first gambling statute (1871 Laws, p. 61), reading in part, as follows:

### "AN ACT

#### "Relating to All Games of Chance.

"Be it enacted by the Legislative Assembly of the Territory of Idaho, as follows:

"Section 1. A license shall be granted to any person or persons on the payment of fifty dollars per quarter, for each game so kept, of any of the following games, to-wit: Faro, Monte, E-O, or Roulette, Shuffle-board, or any other banking game at cards, dice or other device; Provided, that no person shall have a license for Three Card or French Monte, or the game commonly called the Thimble game, and those games are hereby made unlawful."

In January, 1878, the territorial supreme court, in construing this statute, in the case of People v. Goldman, 1 Ida. 714, 715, held: ". . . . when the legislature provided that certain games might be kept on being licensed, and that certain others should be unlawful,

they intended that the keeping of all games not named in' the act should be legalized. It would not be reasonable to attribute any other intention. If we were in doubt as to the interpretation to be given to this act, on account of any ambiguity, we might resort to the title of the act, which is, 'An act relating to all games of chance,' but we do not consider this necessary."

By Act of February 5, 1885, the Thirteenth Session of the Legislative Assembly of the Territory amended sec. 88 of the revenue statute (8th Terr. Sess. Laws, 1874-75, p. 513), to read as follows:

"A license shall be granted to any person or persons, on the payment of fifty dollars per quarter for each game so kept of any of the following games, to-wit: Faro, monte, twenty-one, or any other banking game or games at cards, dice, or other device. Provided, that no person shall have a license for French monte, three-card monte, EO or roulette, or the game commonly called the thimble game, or for percentage stud poker or any other percentage game at cards, dice or other device; and those games are hereby made unlawful. And provided further, that any person or persons who shall keep or deal or be in any wise interested in any of the games hereby declared to be unlawful, shall be deemed guilty of a misdemeanor, and subject to the provisions, fine and penalties specified in sec. 89 of said act." (13th Terr. S. L., 1884-85, p. 161.)

The gambling statute, contained in Rev. Stat. 1887, sec. 6850, was as follows:

"Every person who deals, plays, or carries on, opens or causes to be opened, or who conducts, either as owner or employe, whether for hire or not, any game of French monte, three card monte, E. O. or roulette, or the game commonly called the thimble game, or percentage stud poker, or any other percentage game played with cards, dice, or any other device, for money, checks, credit, or any other representative of value, is punishable by fine of not less than one hundred nor more than three hundred dollars, and shall be imprisoned in the county jail until such fine and costs of prosecution are paid, such imprisonment not to exceed six months."

The constitutional convention met in 1889 and submitted, and the people ratified, sec. 20, art. III, Constitution, reading as follows:

"The legislature shall not authorize any lottery or gift enterprise under any pretense or for any purpose whatever." (See p. 1248, vol. II, Proceedings Const. Conv., 1889.)

By act, approved March 6, 1893, sec. 6850, R. S., was amended as follows: "The game commonly known as 'craps,' 'strap game,' 'thimberlig game,' 'patent safe game,' 'black and red game' commonly

known as the 'ten dice game,' 'two card box at faro,' or any similar game or games, or any other percentage game played with cards, dice or any other device for money, checks, credit or any other representative of value, or shall induce, or attempt to induce, any person whatever, to make, any bet or wager at any such games, is punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding three hundred dollars or by both." (1893 Sess. Laws, p. 163.)

Again, in 1897 ('97 Sess. Laws, p. 53) the section was amended to read:

"Every person who deals, plays or carries on, opens or causes to be opened, or suffers or permits to be opened, or who conducts, either as owner, employee or lessee; whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noir, rondo, or any game played with cards, dice, or any other device, for money, checks, credit or any other representative of value, is guilty of a misdemeanor, and is punishable by fine not less than two hundred dollars or imprisonment in the county jail not less than four months."

February 6, 1899, the fifth session of the state legislature amended the '97 law by deleting the words "or suffers or permits to be opened"; also by changing the word "value" to "values." (1899 Sess. Laws, p. 389.)

In re Rowland, 8 Ida. 595, 596, 70 Pac. 610, the court held: "Under the statute in question here, one who deals a game of cards, plays a game of cards, or carries on a game of cards for money, checks, . . . . whether he is the owner of such game or not, is guilty of a misdemeanor. The object of the statute is to prevent gambling."

And in Mullen & Co. v. Moseley, 13 Ida. 457, 468, 90 Pac. 986, 989, 12 L.R.A., N.S., 394, 121 Am. St., 277, 13 Ann. Cas. 450, the court again said:

"The most effectual method of preventing the crime is to destroy the specific instruments designed and kept for its perpetration. This is peculiar to the crime of gambling as to few other crimes . . . .

"It is generally difficult to detect and get hold of the players of unlawful and prohibited games on account of their alertness and ready means of locomotion, but the dumb instruments they leave behind for obvious reasons are always ready for business, and the law contemplates disabling them as a most effective way in which to prevent the recurrence of the offense. They are a menace to the welfare of the community, and invite breaches of the law. The public authorities are required to destroy them for the same reason that

they would destroy dies and plates for counterfeiting or the stills and vats of the moonshiner."

The last amendment of this statute is to be found in 1921 Session Laws, chap. 116, p. 292. The only change there noted is the addition of the words "Indian stick game" after the word "rondo" in the fourth line of the section. This section is now sec. 17-2301, I.C.A. (1932).

The present statute (sec. 17-2301) received consideration in **State v. McNichols,** 62 Ida. 616, 117 Pac. (2d) 468.

The case of *People v. Goldman,* 1 Ida. 714, decided in 1878, under the first territorial "act relating to all games of chance," simply applied the familiar doctrine of "ejusdem generis" and held the statute there in question supplanted the common law in relation to "games of chance."

In support of the contention, that the words, "or any other device," contained in our present statute, were intended only to preclude *similar* or *like* games and devices to those enumerated, great reliance is placed on the case of In re. Hull, 18 Ida. 475, 110 Pac. 256, 30 L.R.A., N.S., 465. That case involved the construction of a Sunday closing law, in so far as it related to opening and operating certain types of amusement on Sunday. The statute was regulatory only, enumerated a long list of places of amusement that should not be opened on Sunday and concluded with the words, "or any such place of amusement . . . ."; and this court held that by the use of the word "such," it was intended to prohibit only other amusements "like or similar to those specified"; and that a "scenic railway" was not similar to or like anything specifically prohibited by the act.

The act before us now contains no word of limitation or modification and does not pretend to limit its prohibitive terms to only *such* games and devices as previously enumerated, but places a prohibition on *"any other* device," employed in gaming and gambling. The members of the legislature, who enacted this statute, were men of experience and were undoubtedly conscious of the difficulty of trying to enumerate all the various games and devices the gambling genius of men might contrive for games of chance; and so, after enumerating those currently employed, they sought to anticipate what subsequently happened, viz., the invention and manufacture of new devices designed to intrigue the unwary and arouse the latent cupidity of human nature into

the notion that it could get something for nothing, or amusement out of paying tribute to what have aptly been quipped, "bandit machines."

The fact that the 1941 session of the legislature attempted to amend the statute, which met with a veto from the governor and never became a law, can have no weight or value in the construction or enforcement of the statute as it comes to us from the legislature that enacted it.

We recognize and have often invoked the rule of construction that, where general words of a statute follow an enumeration of persons or things, such general words will be construed as meaning persons or things of *like or similar* class or character to those specially enumerated; usually designated the "ejusdem generis" rule. (In re Winton Lumber Co., 57 Idaho 131, 135, 63 Pac. (2d) 664; 28 C.J.S., p. 1049.)

"This rule is but one of construction and does not warrant a court in confining the operation of a statute within narrower limits than intended by the legislature." (*Commonwealth v. Klucher*, 326 Pa. St. 587, 193 Atl. 28.)

In the case before us, the legislature evidently did not intend that the "ejusdem generis" rule should apply in the enforcement of this statute and emphasized that intent by the words "or any other device." Similar terms have received a like construction by other courts. (*Grafe v. Delgado*, 30 N. M. 150, 228 Pac. 601; *People v. Carroll*, 80 Cal. 153, 22 Pac. 129; *Salt Lake City v. Doran*, 42 Utah 401, 131 Pac. 636, 637.)

The pinball machines are of comparatively recent introduction to the public and are the progeny of the well-known, omnipresent slot machine—simply a specie of that numerous family. (*Times Amusement Corp v. Moss*, 160 Misc. 930, 290 N. Y. Supp. 794 (affirmed, 247 App. Div., 771, 287 N.Y.S. 327); *International Mutoscope Reel Co. v. Valentine*, 247 App. Div. 130, 286 N.Y.S. 806 (affirmed, 271 N. Y. 622, 3 N.E. 2d 453); *Shapiro v. Moss*, 245 App. Div. 835, 281 N.Y.S. 72 (affirmed 1 N.E. 2d 353); *People ex rel Ellison v. Lavin*, 179 N. Y. 164, 71 N.E. 753, 66 L.R.A. 601, 1 Ann. Cas. 165; *People v. Gravenhorst*, 32 N.Y.S. 2d 760, 766.) But, everywhere they have had an introduction to the courts, they have been judicially branded as machines for taking the players' money "on chance."

They are gambling devices. (*People v. Swartz*, 282 N. Y. 596, 25 N. E. 2d 386.)

It is well said by Judge Haddock, in *People v. Gravenhorst*, supra, that:

"He would be a credulous person indeed, who could believe that the customers playing for nothing but points, expected only amusement, and were not actuated by the belief that they could use them to obtain money or other things of value. *Chambers v. Bachtel*, 5 Cir. 1932, 55 F. 2d 851, 853; *Harvie v. Heise*", etc.

In *Shapiro v. Moss*, 281 N. Y. S. 73, the New York Court of Appeals, in speaking of these machines, said: "In our opinion, the machine was designed primarily for gambling purposes"; and, in *People v. Gravenhorst*, supra, the court said: "This machine is animo et facto a gambling device as it is clearly 'adapted for use' in violation of the statute." As said by the Supreme Court of Maine, in the case of *State v. Googin*, 117 Me. 102, 102 Atl. 970, 971: "It is the dumb agent of its owner, inviting the public to operate it as often and as many times as any one of the public may please."

Judge Francis E. Williams of the St. Louis Circuit Court, and author of "Flexible Participating Lotteries", in a well-reasoned article on the subject of "An 'I. Q.' Lottery Machine," which appeared in Vol. 5, November 1941, issue of The Lawyer, (p. 18) after discussing the chance element in these lottery machines and gaming devices, says:

"In view of the wide-spread knowledge of the illegal and criminal nature of the great majority of these mechanical devices and the deception practiced in their promotion, it seems incredible that any court would permit itself to be deceived by one of them."

In a very exhaustive and instructive opinion, filed in the Court of Special Sessions of the City of New York, on January 21, 1942, in the case of *People v. Gravenhorst*, supra, in which the court reviews the history of slot machine legislation and decisions in that state, and notes their baleful influence, the following surprising information is given:

"A recent survey conducted by one of the Departments of the City of New York disclosed that there were 11,080 such machines now operating in the city having a gross income of upwards of $20,000,000 yearly and an average weekly gross income of upwards of $35 per machine, al-

though some earn as high as $100 during that period. The investigation further reveals that between 40 and 50 per cent of this income is paid out in prizes.

"These facts and figures clearly depict the enormous business being conducted by the pin-ball interests. The annual yield in money alone indicates a well-organized gambling enterprise carried on as a regular and flourishing business. The quantity and omnipresence of these devices afford easy accessibility and continuous temptation to the unwary public. The root of the evil lies in the exploitation by professionals of the gambling instinct innate in human nature. This, the statute condemns and seeks to eliminate not by regulatory prohibitions but by absolute suppression."

To the same effect, reciting evils resulting from installation and use of these machines, see *Savoy Vending Co., Inc., v. Valentine,* 178 Misc. 1, 33 N.Y.S. 2d 324, decided February 11, 1942.

The payment of taxes on, or licensing of, a gambling machine or device, furnishes no defense or justification for its operation in violation of the anti-gambling laws. (*Martin v. State,* (Tex. Cr. App.) 162 S. W. 2d 722; *State v. Abbott,* 218 N. C. 470, 11 S. E. 2d 539, 544.)

The courts have, with but few exceptions, pronounced pinball machines *gambling devices* and violation of the usual anti-gambling statutes of the various states. See *State v. Wiley,* (Iowa) 3 N. W. 2d 620; *People v. Gravenhorst,* supra; *State ex rel Dussault v. Kilburn,* 111 Mont. 400, 109 Pac. 2d 1113; 135 A.L.R. 99 and note; *Steed v. State,* 189 Ark. 389, 72 S.W. 2d 542; *State v. Googin,* supra; *State ex rel Green v. One 5c, etc., Base Ball Machine,* 241 Ala. 455, 3 So. 2d 27; *Hightower v. State,* (Tex. Civ. App. 156 S. W. 2d 329; *People v. Kay,* 38 Cal. App. 2d (Supp.) 759, 102 Pac. 2d 1110, 1111; *Affiliated Enterprises v. Waller,* 40 Del. 28, 5 Atl. 2d 257, 259; *Middlemas v. Strutz,* (N. D.) 299 N. W. 589; Ex Parte Davis, 66 Okla. Cr. 271, 91 Pac. (2d) 799, 808; *Hunter v. Mayor, etc., of Teaneck Tp.,* 128 N.J.L. 164, 24 Atl. 2d 553, 556; *Brassel v. Benham,* (Ohio Ct. App.) 32 N. E. 2d 482; *Alexander v. Hunnicutt,* 196 S. C. 364, 13 S. E. 2d 630; *State v. Fuller,* 164 Ore. 383, 101 Pac. 2d 1010; *Braoddus v. State,* 141 (Tex. Cr. App.) 512, 150 S. W. 2d 247; *Kraus v. City of Cleveland,* 135 (Ohio St.) 43, 19 N. E. 2d 159; *Rex v. Arnold,* 60 Ont. L. Rep. 582, 48 Can. Crim. Cas. 101, 4 D.L.R. 206, 81 A.L.R.

180 (note); *Sowma v. Parker*, 112 (Vt.) 241, 22 Atl. 2d 513; In re Sutton, 148 (Pa. Sup. Ct.) 101, 24 Atl. 2d 756.

We refrain from any attempt to make specific definition of a gambling "device", within the meaning of the statute, but rather content ourselves with the conviction, that a pinball machine *is* such a "device." The reasons for so refraining are aptly stated by the supreme court of Delaware in a lottery case, thusly:

"It is best, perhaps, not to define the word 'lottery' too precisely, for the reason that human ingenuity is too frequently successful in evolving a scheme entirely within the mischief, but not quite within the letter of the definition. *People v. McPhee*, 139 Mich. 687, 103 N. W. 174, 69 L.R.A. 505, 5 Ann. Cas. 835."

(*Affiliated Enterprises v. Waller*, supra.)

The order and judgment appealed from is affirmed. Costs awarded in favor of respondents.

Givens, C. J., Morgan and Holden, JJ., and Porter, D. J., concur.

Budge, J., deeming himself disqualified, did not participate and Porter, District Judge, was called in his stead.