206 P.2d 770

## WILLARD v. FIRST SECURITY BANK OF IDAHO et al.

No. 7506.

Supreme Court of Idaho.

May 13, 1949.

F. E. Tydeman, of Pocatello, for appellant.

Jones, Pomeroy & Jones and Merrill & Merrill, all of Pocatello, for respondents.

HOLDEN, Chief Justice.

This action is brought by Marie Willard as administratrix of the estate of Clarence Mathers, deceased, against First Security Bank of Idaho, N. A., and Charles H. Bohrer and Hannah Marie Bohrer, husband and wife, to set aside a sale of 63⅓ shares of the capital stock of the Pocatello Lumber Company and to have said shares of stock delivered to plaintiff, and also to recover from the bank, guardian, the sum claimed to have been earned as dividends on the stock since the date of the sale.

It appears from the record that, November 1, 1935, Clarence Mathers was adjudged an incompetent person and the First Security Bank of Idaho, N. A., was upon order of the probate court of Bannock county, Idaho, appointed guardian of his estate. At that time the incompetent's estate consisted of cash on hand in the sum of $228.-15, 63⅓ shares of the capital stock of the Pocatello Lumber Company, a corporation, land valued at $1,500 and United States Government bonds in the sum of $417.

The Pocatello Lumber Company is a corporation doing business at Pocatello and operates a retail lumber and coal business. The capital stock of the corporation orig-

inally was of the par value of $50,000 divided into 500 shares of $100 per share. At the time of the sale of the ward's interest in the stock, his father and mother also owned similar amounts. The remaining stock was owned by the respondents, Charles H. Bohrer and Hannah Marie Bohrer. Charles H. Bohrer had the complete management of the business at all times. December 4, 1936, Eva Mathers, the mother of the ward, sold her stock amounting to 63⅓ shares to Charles H. Bohrer for $9,000. August 20, 1937, Alexander Mathers, the father of the ward, also sold his stock amounting to 63⅓ shares to Charles H. Bohrer for $8,500. December 3, 1936, the stock of the ward was appraised at the sum of $5,000.

It further appears dividends were paid on the ward's stock as follows: December 22, 1937, $506.67; December 3, 1938, $506.67; December 26, 1939, $950; January 3, 1940, $316.65, and January 2, 1941, $506.64. There was an increase in the valuation of the stocks during those years. In October, 1941, the corporation took steps to increase its capital stock from $50,000 to $100,000 and to that end served on Mr. Comstock, the trust officer of said guardian, a notice calling a meeting of the stockholders of said company to consider and act upon the proposal. Up to that time no thought or consideration had been given to the matter of selling the ward's stock. All of the increased stock was to be offered to the various holders proportionately at par value. That was so understood by the guardian and the Bohrers. When such proposal was made Mr. and Mrs. Bohrer owned all the stock of the corporation except the shares owned by the ward, and at that time there was on deposit in the ward's estate the sum of $2,485.59. The amount necessary to have purchased the ward's interest in the new capital stock would have been $6,333.33. Business conditions were then uncertain. Restrictions had been imposed upon the purchase and sale of such merchandise as the company handled. It was limited in the amount of lumber it could purchase and it was getting lower in stock.

After notice to increase the capital stock was served on the guardian, a proposal was made to sell the ward's stock to Mr. Bohrer. December 3, 1941, the stock was re-appraised at $12,666.67. The guardian decided upon the sale of the stock and submitted the matter of the sale to its counsel, Hon. T. D. Jones, after which notices were posted in manner and form as provided by law. Mr. Bohrer's bid was accepted and the return on the sale was filed in the probate court and notice thereupon duly given for hearing on the return. Upon the hearing the probate court entered its order confirming the private sale of the shares to Charles H. Bohrer and Hannah Marie Bohrer for the sum of $15,000. The order was dated December 23, 1941. After the sale was completed the money was paid by Mr. Bohrer, and the guardian invested $13,000 of the sale price in United States government bonds and placed the balance to the account of the guardian. The re-

turn of said sale of said stock recited among other things, that the reason for the sale was that it was to the best interests of the estate of the ward to sell it.

Clarence Mathers was a world war veteran and accordingly notices of all proceedings concerning the sale of the stock were served upon the Veterans' Administration, Boise, Idaho. No objections to the confirmation of the sale were made and an order confirming the sale was duly entered.

The cause was tried April 29, 1948, on the amended complaint of the administratrix and the answers, respectively, of respondents, First Security Bank and Charles Bohrer and Hannah Marie Bohrer.

The principal grounds alleged in the amended complaint for setting the sale of the shares aside are that the sale was made without statutory or other authority, and further that the sale constituted a fraud upon the estate of the ward, Clarence Mathers, now deceased, which allegations were denied by respondents, respectively. The trial court found against appellant, finding, among other things, the sale of the stock was not made contrary to statutory provisions relative to the sale of personal property belonging to a ward, and that the sale was made in all respects in conformance to law, and that the sale did not constitute a fraud upon the estate of the ward; and further, that the sale was fairly and legally made, and accordingly decree was entered thereon, from which the administratrix appeals.

We turn now to the consideration of the controlling and decisive question presented by the record on this appeal: Was the sale of the ward's stock made with statutory authority?

Title 15 covers completely the "Administration of Estates of Decedents, Wards and Absentees", I.C., Vol. 3, page 63. By chapter 18 of that title, entitled "Guardian and Ward" it is provided:

Sec. 15-1829, I.C.

"When the income of an estate under guardianship is insufficient to maintain the ward and his family or to maintain and educate the ward when a minor, or to pay for his care, treatment and support, if confined in a hospital for the insane, his guardian may sell or mortgage his real or personal estate, for that purpose, subject to confirmation of such sale or mortgage by the court."

It is contended by appellant that the "ejusdem generis" rule should apply to the enforcement of the above-quoted section. This court held in Pepple v. Headrick, 64 Idaho 132, 141, 128 P.2d 757, 761: " 'This rule [ejusdem generis] is but one of construction and does not warrant a court in confining the operation of a statute *within narrower limits than intended by the legislature* [emphasis added].' "

Whether, then, the above-quoted section limits the sale of personal property of an estate under guardianship to a case where the income is insufficient to educate the ward, when a minor, or to pay for his

care, treatment and support, depends upon the intent of the legislature. This court is committed to the rule that legislative intent is the main lodestar of construction. Northern Pac. R. Co. v. Shoshone County, 63 Idaho 36, 40, 116 P.2d 221, and cases there cited.

What might reasonably happen to an estate under guardianship if the rule contended for by appellant were adopted? Respondents answer the question quite logically, thus:

"To illustrate: Assume the guardian has some stock that is rapidly declining in value but which could be sold and the proceeds secured therefrom placed in a secure investment. Or, suppose that the guardian has sufficient money to support the ward and has wheat or produce grown upon the land of the ward, or cattle from his herds, or sheep from his flocks. Can it be said that a guardian has no authority under the Idaho statutes to sell any of the same? Or must he let the same waste? Or, suppose the ward has an automobile and is not able to use it himself. The guardian can't use it. Must the guardian let the automobile rust and depreciate because he cannot sell it and invest the proceeds in government bonds? Numerous other illustrations could be given. Can it then be said that the guardian cannot protect the estate of the ward by the sale of such properties?"

Decline in the value of corporate shares is not something either unusual or imaginary, neither is the decline in the value of livestock or grain fanciful. That declines in shares of stock as well as declines in the value of livestock and grain occur frequently; in fact, almost daily, are matters of common knowledge. And, while, of course, there are not as many instances of administrations of estates of wards as there are of decedents, still and nevertheless, the reason for protecting the estates of wards is at least as necessary and demanding as in estates of decedents. By section 15-710, I.C., the legislature fully and amply protected estates of decedents from all the hazards of declining values of personal property by providing that personal property of such estates may be sold "when it is for the advantage, benefit and best interests of the estate". Surely, then, the legislature could not have intended to deny the estates of wards the same protection it gave estates of decedents.

For the reasons above stated, it seems clear the legislature, by the enactment of sec. 15-1829, supra, simply intended a grant, rather than a limitation, of power, in the matter of a sale by a guardian of an incompetent's personal estate. Furthermore, it is thought the provisions of secs. 15-1808, 15-1817 and 15-1834, I.C., lend further support to such legislative intent.

Judgment affirmed, with costs to respondents.

GIVENS, PORTER, TAYLOR and KEETON, JJ., concur.