MARIE (GROVER) FEURHERM, AND W. C. NEISS, PLAINTIFFS, RESPONDENTS AND CROSS-APPELLANTS, *v.* DONALD E. SCHMAING, CLARA SCHMAING AND AXEL A. SCHMAING, DEFENDANTS AND APPELLANTS.

No. 14116.
Submitted Oct. 19, 1978.
Decided March 12, 1979.
Rehearing Denied April 18, 1979.
592 P.2d 924.

Hutton & Cromley, Rodney T. Hartman (argued), Billings, for defendants and appellants.

Crowley, Haughey, Hanson, Toole & Dietrich, L. Randall Bishop (argued), Billings, for plaintiffs, respondents and cross-appellants.

MR. JUSTICE SHEA, delivered the opinion of the Court.

Defendants, Donald Schmaing, Clara Schmaing, and Axel Schmaing appeal from a jury verdict and judgment of the Yellowstone County District Court concluding and ordering that a beer license was owned by and must be transferred to W. R. Neiss, one of the plaintiffs in this action. Plaintiff Neiss cross-appeals contending he was entitled to an award of damages by the jury because of the Schmaings' wrongful withholding of the license, and that he is entitled to an award of attorney fees.

The dispute as to ownership of the beer license, which has now become quite valuable due to the statutory quota system of this state, arose because of a vague policy of enforcement by the agency which regulates the issuance and control of liquor and beer licenses, the Liquor Division of the Department of Revenue, formerly the Liquor Control Board. The main question with which we are concerned, and which prompted this lawsuit, relates to which names should be listed on a beer license when more than one party claims some interest in the license. The Schmaings contend that because only their names were listed on the beer license, they are the true owners. On the other hand, plaintiffs Feurherm and Neiss contend that they have an *equitable* interest in the license which must be recognized and that they are the sole owners of the beer license.

The factual chronology leading to this controversy is as follows. The disputed beer license has always been used in a bar located in the Carlin Hotel in Billings, Montana. The license first came into existence in 1961 when Louis Brown, who owned the Carlin Hotel, obtained a beer license from the state. For some time Brown leased the bar to various operators and assigned the license to each of the operators so that they could operate the bar. The procedures used in the assignment caused some of the problems which exist in this case.

While Brown owned the Carlin Hotel, there were seven different lessees of the bar over a period of aproximately four years. On each occasion Brown would enter into a written lease with the lessee whereby the preismes, stock, and fixtures were leased. In addition, the lease contained provisions with relation to the beer license. Specifically, it provided that at the commencement of the lease the lessee would pay the costs of transferring the beer license from the lessor to the lessee, and, at the expiration of the lease, the lessor would pay the cost of transferring the beer license back to the lessor. In addition, the lessees agreed that they would not attempt to transfer the beer license to a third person during the term of the lease. The lease also provided that the lessor reserved the right to sell the premises during the term of the lease. If the premises were sold the lease would terminate upon thirty days written notice to the lessee. The lease also provided that in such event the lessee would vacate the premises at the expiration of the thirty-day period, surrender possession to the lessor, and transfer the beer license back to the lessor. This same language was contained in all the leases that are involved in this case.

The actual transfer of the beer license, however, was not accomplished according to the terms of the lease. That is, the beer license was not conveyed directly back to the lessor. Rather, the transfer took place from lessee to successor lessee. Brown accomplished his objective of transfer of the beer license by having the beer license transferee, the lessee of the premises, sign a blank assignment whereby the space for the name of the successor transferee of the beer license was left blank. Brown retained posses-

sion of the blank assignment and when one of the lessees ceased operating the bar, he would simply fill in the name of the successive lessee in the blank part of the assignment. The assignment would then be sent to the regulatory agency with a request to transfer the beer license to the person named in the assignment. On each occasion the regulatory agency effectuated the transfer. At all times the only names on the licenses were the names of those persons who were operating the bar under the lease from Brown. On several occasions, including that which is in dispute here, the lease was not sent to the regulatory agency along with a copy of the assignment. The result was that the regulatory agency had no documentary evidence that anyone other than the beer licensees claimed an interest in the license. It was the seventh transfer in this fashion that marked the beginning of the dispute with which we are here concerned.

The seventh transfer took place as a result of the June 10, 1964 sale of the Carlin Hotel by Brown to Marie Grover Feurherm. The sale provisions in the contract for deed provided that Feurherm also purchased the beer license, but no separate price was established for the license. Shortly after she purchased the hotel, Feurherm indicated that she wanted the Schmaings, Donald, Clara and Axel, who are related as husband, wife and son, to run the bar. Therefore, it was necessary for them to have the beer license. Feurherm had obtained a blank assignment from the former lessees, Dale and Peggy Meurer. She simply filled in the names of the Schmaings in the blank spots on the assignment and sent it in to the regulatory agency, requesting that the beer license be transferred to the Schmaings. Shortly after this was done, the Schmaings began operating the bar in the Carlin Hotel. The Schmaings did not sign a lease with Marie Feurherm in order to operate the Carlin Bar, but they did sign a blank assignment, as had all the predecessor lessees. Marie Grover Feurherm retained the blank assignment. When the Schmaings received the beer license from the regulatory agency, they were the only owners listed on the beer license.

After they had obtained the beer license but before they had actually started running the bar in the Carlin Hotel, Marie Grover Feurherm negotiated, on March 9, 1965, a sale of the hotel to W. C. Neiss. The sale also included the beer license, although, again, no separate price was established for it. Shortly thereafter, the Schmaings began running the bar in the Carlin Hotel under the beer license issued in their names. The Schmaings operated the bar from 1965 until April 1976 and paid the annual license fee to the regulatory agency each year to renew the license.

It appears from the record that the first time the Schmaings signed a lease for the premises was in 1971, although Axel Schmaing never signed the lease. Thereafter, on a tab appended to the lease, they signed a renewal of the lease each year. Concerning the beer license, the lease contained the same provisions as the lease between former owner Louis Brown and all of his lessees.

For several years things went well. The last renewal slip was signed in April 1974, which extended the lease to April 1975. For some reason a renewal slip was not signed for the year of April 1976 to April 1975, but the Schmaings stayed in possession of the bar with the permission of Neiss and paid their monthly rental. In March 1976, however, Neiss decided to terminate the lease because he intended to sell the hotel together with the bar and beer license. He gave notice to the Schmaings and requested that, according to the terms of the lease, they reconvey the beer license to him. The Schmaings refused to do so, contending that they owned the beer license. Alternatively, the Schmaings asserted that if Neiss wanted them to reconvey the beer license to him, he must pay them a reasonable price. From the time the Schmaings had first begun operating the bar until 1976, the value of a beer license had skyrocketed to approximately $25,000.

After the Schmaings had refused to convey the beer license to Neiss, Neiss somehow learned that Marie Grover Feurherm was still holding the old blank assignment executed by the Schmaings in 1965. In an effort to help Neiss, she filled in his name as the transferee, and then Neiss sent the assignment, together with a copy

of the lease aggreement to the regulatory agency. On the strength of these two documents, he requested that the beer license be transferred to him. The Schmaings learned of this and filed a protest with the regulatory agency, contending that they owned the beer license. Because of the conflicting claims, the regulatory agency refused to issue a beer license to either party pending a determination of ownership. As a result, Feurherm and Neiss filed this lawsuit and the Schmaings counterclaimed.

Neiss demanded that the Schmaings be compelled to transfer the license to him and pay damages for the rent he could reasonably have expected to receive under a lease of the Carlin Bar commencing April 1, 1976. The Schmaings argued, on the other hand, that they were entitled to the beer license and also entitled to damages for the profits they would reasonably have expected to make operating a retail bar in Billings commencing April 1, 1976.

The jury found that Neiss and Feurherm were entitled to the beer license under the provisions of the documents involved, but they refused to award any damages to the plaintiffs, having been advised by the court during their deliberations, with the full acquiescence of the plaintiffs, that the decision of whether to award damges and the amount of such damages was totally within their discretion.

While several issues are raised concerning evidentiary questions at trial and jury instructions, we think that one legal question raised by the Schmaings is dispositive of this case. Accordingly, there is no need to discuss the other issues involved.

The issue that we must decide is whether, under the current state of Montana law, a person who claims equitable ownership of a beer license and wishes to have the license transferred to him, may enforce his claim when he has never been the record owner of the license, his name has never been endorsed on the license in any other capacity and, as a result, he has never been subjected to the scrutiny of the Liquor Division of the Department of Revenue throughout the time he has claimed his equitable interest.

No case in Montana has addressed a situation like the one

presented in this case. As a result, we must examine the legislative intent evident in the statutory scheme of the Montana Alcoholic Beverage Code through close scrutiny of pertinent statutes. Where applicable we must examine previous holdings of this Court where we have addressed related questions.

Initially we note two things:

"The right to manufacture and traffic in intoxicating liquors is one which is exercised subject to the regulation and control of the police power of the state; a power of which the Legislature cannot divest itself (citations omitted); and such body is the exclusive judge of the manner in which such police power shall be exercised . . ." *State v. Andre* (1936), 101 Mont. 366, 371, 54 P.2d 566,568.

This principle has been a part of Montana law throughout the effective period of the State Liquor Control Act of Montana and the Montana Beer Act. Most recently it has been clarified in section 4-1-101, R.C.M. 1947, now section 16-1-101(3) MCA of the Montana Alcoholic Beverage Code.

"This code is an excercise of the police power of the state, in, and for the protection, of the welfare, health, peace, morals and safety of the people of the state and its provisions shall be construed for the accomplishment of such purposes."

Secondly, we note the relationship between the State Liquor Control Act of Montana and the Montana Beer Act in terms of underlying policy with respect to licensing. The legislature has combined these provisions in the Montana Alcoholic Beverage Code. Thus, what has been said concerning liquor licenses, more often than not, has applied to beer licenses.

The Montana Legislature adopted the State Liquor Control Act of Montana and the Montana Beer Act, Ch. 105 and 106, Laws of Montana (1933), in anticipation of the adoption of the Twenty-First Amendment to the United States Constitution ending Prohibition. The acts became law when the amendment was declared in force on December 5, 1933. They were amended on a number of occasions and ultimately replaced by the Montana Alcoholic Beverage Code, Ch. 387, Laws of Montana (1975).

Perhaps the most significant amendment to the former law was the amendment establishing a quota system for beer and liquor licenses within the state, Ch. 225 and 226, Laws of Montana (1947). The quota system has made beer and liquor licenses very difficult to obtain and, as a result, they are "treasure[s] to be eagerly sought". *Sullivan v. Marsh* (1950), 124 Mont. 415, 421, 225 P.2d 868, 872. This Court has variously characterized these licenses as "saleable . . . personal property of value . . . subject to attachment", *Stallinger v. Goss* (1948), 121 Mont. 437, 438, 193 P.2d 810, and as,

". . . a matter of privilege rather than of right. The privilege is personal to the licensee. The license is neither a right of property, nor a contract or contract right, in the legal or constitutional sense of those terms. Such liquor license does not run with the business conducted under the privilege it grants and is not an asset of it." *Sullivan*, 124 Mont. at 426, 225 P.2d at 874.

See also *State ex rel. Victor's Inc. v. Dist. Ct.* (1976), 169 Mont. 110, 118, 545 P.2d 1098, 1102. More recently, the legislature characterized licenses in section 4-4-108, R.C.M. 1947, now section 16-4-401 MCA, as "a privilege which the state may grant to an applicant and . . . not a right to which any applicant is entitled."

Other jurisdictions have considered attempting to characterize these licenses. For exemple, the Florida Supreme Court state that "due to the limitations respecting the number and location of liquor establishments and the conditions under which the license is issued, a liquor license has come to have the quality of property, with an actual pecuniary value far in excess of the license fee exacted . . ." *House v. Cotton* (Fla. 1951), 52 So.2d 340, 341. Another court stated that a "liquor license is a legal interest in the nature of an economic asset, created and protected by statute, and because it has monetary value and is transferable . . . it possesses the qualities of property." *Boss Co. v. Board of Com'rs. of Atlantic City* (1963), 40 N.J. 379, 385, 192 A.2d 584, 587.

■ Turning to the Montana Alcoholic Beverage Code and

various prior statutes which were in effect during part of the time in which this controversy arose, we reaffirm our stance that "[p]ermission to engage in the sale of liquor is predicated upon compliance with the statutory scheme, which must be more than merely colorable compliance." *State ex rel. Gillespie v. Liquor Control Bd.* (1967), 150 Mont. 26, 30, 430 P.2d 112,115.

A pertinent portion of the policy provision of the code states:

"It is hereby declared to be the policy of the state of Montana to effectuate and ensure the *entire* control of the manufacture, sale and distribution of liquor within the state of Montana . . . subject to the authority of the state of Montana through the Montana department of revenue." (Emphasis added.) Section 4-1-101, R.C.M. 1947, now section 16-1-101(2) MCA.

Substantially similar language appeared in section 4-101, R.C.M. 1947. In an industry fraught with potential for abuse and corruption, the state has taken over the entire control of, among other things, the power and prerogative of granting licenses to persons desirous of engaging in the liquor business. This has been done for the expressed purpose of ". . . protection, of the welfare, health, peace, morals and safety of the people of the state . . ." Section 4-1-101, R.C.M. 1947, now section 16-1-101(3) MCA.

Section 4-4-104, R.C.M. 1947, now section 16-4-104 MCA, provides in pertinent part:

"(1) Any person desiring to possess and have beer for sale . . . for the purpose of selling it at retail shall first apply to the department for a permit to do so . . .

"(2) Upon being satisfied, from such application or otherwise, that the applicant is qualified . . . the department shall issue a license to such person . . .

"(3) If the department shall find that the applicant is not qualified, no license shall be granted . . .

"(4) The department shall have the right . . . to make, at any time, an examination of the books of account of any such retailer and of his premises and otherwise check his methods of conducting business and the alcoholic content of the beer kept by him for sale.

"(5) A person may not sell beer at retail without a valid license issued under this code."

It is certainly evident from this statute and from its predecessor, section 4-310, R.C.M. 1947, that the legislature intended that the department's control would be extensive and its knowledge complete. This is clarified even further in section 4-4-108, R.C. M. 1947, now section 16-4-401 MCA which provides in pertinent part:

"The department *must find in every case* where it makes an order for the issuance of a new license or for the approval of the transfer of a license that:

"(1) neither the applicant nor any member of his immediate family has an ownership interest in any other establishment under this chapter for all-beverages sales;

"(2) the applicant or any member of his immediate family is without financing from or any affiliation to a manufacturer, bottler, or distributor of beer, wine, or liquor;

"(3) the applicant is a resident of the state and is qualified to vote in a state election; and

"(4) the applicant's past record and present status as a purveyor of alcoholic beverages and as a businessman and citizen demonstrate that he is likely to operate his establishment in compliance with all applicable laws of the state and local governments." (Emphasis added.)

Section 4-4-206, R.C.M. 1947, now section 16-4-204 MCA establishes and clarifies requirements regarding essential elements of a license.

"(1) Every license issued under this part shall set forth the name of the person to whom issued, the location, by street and number or other appropriate specific description of location if no street address exists, of the premises where the business is to be carried on under said license, and such other information as the department shall deem necessary . . . *[I]f more than one person has any interest in the business operated under the license, the names of all persons . . . interested in the business must appear on the license . . .*

"(2) Any license issued under the provisions of this part shall be

considered a privilege personal to the licensee named in the license and shall be good until the expiration of the license unless sooner revoked or suspended.

" . . .

*"(7) . . . [S]uch license may be subject to mortgage and other valid liens, in which event the name of the mortgagee, upon application to and approval of the department, must be endorsed on the license."* (Emphasis added.)

Before discussing what we perceive to be the underlying theme of these statutes, one further statute, which affects the others, should be noted. Section 4-4-402, R.C.M. 1947, now section 16-4-406 MCA, addresses the power of the Department of Revenue, formerly the power of the liquor Control Board, under section 4-342, R.C.M. 1947, to suspend or revoke a license. It provides:

"The department may upon its own motion and shall upon a written, verified complaint of any person investigate the action and operation of any brewer, wholesaler, or retailer licensed under this code. If the department, after investigation, shall have reasonable cause to believe that any such licensee has violated any of the provisions of this code or any rules of the department, it may, in its discretion and in addition to the other penalties herein prescribed, reprimand a licensee, *proceed to revoke the license of any such licensee* or it may suspend the same for a period of not to exceed 3 months or it may refuse to grant a renewal of said license upon the expiration thereof or impose a civil penalty not to exceed $1,500, subject to the opportunity for a hearing under the Montana Administrative Procedure Act." (Emphasis added.)

The department's power to revoke a license granted under this code is doubtless the most effective means by which it can insure the compliance of licensees with all of the provisions of this code. It is a power that can only be utilized with full knowledge on the part of the department of those claiming some interest in the "business operated under the license." Every person applying for a beer license is notified of this provision on the application he submits, which includes the following language:

"That if the undersigned is granted the license applied for, the undersigned will abide by all rules and rugulations of the Division relating to beer or intoxicating liquor, and will not violate any law of the United States, or of the State of Montana or any legal city ordinance relating to beer or intoxicating liquor, and will not knowingly permit any agent or employees so to do, *it being the express understanding that violation of any rule or regulation* of said Division or *of the State of Montana*, or of any city ordinance relating to beer or intoxicating liquor by the undersigned, or any of them, or by any agent or employee of the undersigned, *shall be sufficient grounds for the revocation or suspension of the license herein applied for."* (Emphasis added.)

If we were to approve the purported "equitable ownership" of plaintiff Neiss in the instant case, where he claims to have been the equitable owner of the license in question for a period of ten years without ever having made his claimed interest known to the Liquor Division of the Department of Revenue, we would be sanctioning an unlawful scheme.

Other states have come to similar conclusions. In *Clark v. Tinnin* (1956), 81 Ariz. 259, 263, 304, P.2d 947, 950, the Court stated:

"Any agreement which provides that one party will secure a license and hold it for the benefit of an undisclosed party who has not submitted himself and his qualifications to the scrutiny of the Superintendent contravenes the public policy of this state and is therefore invalid and unenforceable."

Under our statutes, the Liquor Division of the Department of Revenue, in order to have the effective and entire control of the sale of intoxicating liquors, including beer, must be fully apprised of the nature of the interest of each person who claims some interest in the license. The instant case suggests a way in which this requirement is circumvented. Such a scheme could allow one person to own a number of other licenses in direct conflict with the statutes. A. person could frustrate an attempt by the Division to impose the revocation sanction by revealing at the last minute that he is the

true owner of the license rather than the named licensee. Such a scheme cannot be sanctioned by this Court.

The order and judgment of the District Court is reversed and the cause is remanded with instructions for the court to enter an order declaring defendants to be the lawful owners of the beer license. The amount of damages to which defendants are entitled because of the wrongful withholding of the beer license must be determined at a new trial.

Reversed and remanded.

MR. JUSTICES DALY and HARRISON and R. D. MCPHILLIPS, District Judge, sitting in place of MR. JUSTICE SHEEHY, concur.

MR. CHIEF JUSTICE HASWELL, specially concurring.

I concur in the foregoing opinion. I would add that my views were expressed two and one-half years ago in my dissent in *Johnstone v. Svejovsky* (1976), 170 Mont. 504, 554 P.2d 1329. The scheme there as here, is nothing but a subterfuge to avoid control of retail liquor businesses and their operators by the Montana Liquor Control Broad.