647 P.2d 1236

**UPTICK CORPORATION, an Idaho corporation,
Plaintiff-Counterdefendant-Appellant,**

v.

**John AHLIN, Sr., and Agnes Ahlin, husband and wife; John Ahlin, Jr., and Jerry Ahlin, Defendant-Counter-claimants-Respondents.**

No. 13230.

Supreme Court of Idaho.

June 23, 1982.

W. Anthony Park, of Park & Meuleman, Boise, for plaintiff-counterdefendant-appellant.

C. Ben Martin of Martin, Chapman, Martin & Hyde, Boise, for defendants-counterclaimants-respondents.

BAKES, Chief Justice.

Plaintiff appeals from the trial court's declaratory judgment that defendants have a "premises right" to liquor licenses used in plaintiff's business and from reformation of a lease to reflect defendants' interest.

The parties to this action are Uptick Corp., the assignee-lessee of a 1975 lease for premises situated in Garden City, Idaho, commonly known as the Alpine Lounge. Uptick Corp. is the plaintiff appellant herein. Defendant respondents, the lessors of the Alpine Lounge, are John Ahlin, Sr., and Agnes Ahlin, husband and wife, and their sons, John Ahlin, Jr., and Jerry Ahlin. Agnes Ahlin died after commencement of this action, and her personal representative was substituted as a party.

The record reflects that the Ahlins acquired the Alpine Lounge property in 1949. Although they operated the premises as a saloon for a short time, selling beer and some meals, the evidence is undisputed that the Ahlins never acquired in their own name a liquor-by-the-drink license for the premises. Louis Echevarria leased the Alpine Lounge in 1956 and acquired in his own name the original license to sell liquor by the drink on the premises. In 1959, while this lease was in effect, the Idaho legislature enacted I.C. § 23–903, or the so-called "*per capita* law,"[1] 1959 Idaho Sess.

1. In 1947 the legislature passed a comprehensive act for the regulation of the retail sale of liquor by the drink. *See* 1947 Idaho Sess.Laws, ch. 274, codified in I.C. §§ 23–901 *et seq.* Amendments to I.C. § 23–903 in 1959 limited the number of liquor licenses that could be

Laws, ch. 118, § 1, entitling the owner of the liquor license originally issued to Echevarria to the grandfather right to renew the license.

Louis Echevarria formed a partnership with Antonio 'Swede' Ares in 1959, and the Ahlins negotiated a new lease for the Alpine Lounge with the partnership for the period of July 1, 1959, through January 1, 1964. The lease provided that the lessee may sell intoxicating liquors on the premises, provided the proper licenses were obtained by the lessee, and contained the following provision: "6. It is also understood that the license for these premises are not to be transferred or sold to any other premises."

The trial court found that Agnes Ahlin understood and insisted that the liquor license always remain with the premises, relying on paragraph 6 to restrain any transfer. Over plaintiff's hearsay and parol evidence objections, the trial court admitted testimony that Louis Echevarria also understood that the license be restricted to the Alpine Lounge. Antonio Ares, on the other hand, asserted that the license could be moved; however, he never attempted to do so. Upon dissolution of the Echevarria-Ares partnership in October, 1960, Echevarria sold all of his interest in the business, including the liquor license, to Antonio Ares.

During the next several years, from December 5, 1963, to 1974, Antonio Ares, and subsequently his son John, operated the Alpine Lounge. The Ahlins leased the premises to the Areses for varying terms throughout this period. The intervening leases contained in the record all included

the same clauses regarding restrictions on the transfer of the licenses to sell liquor by the drink that appeared in the 1959 lease.

The trial court found that on February 4, 1974, John Ares sold the business, including the liquor licenses, to Jerry Ball for $11,100. Ball obtained a new lease from the Ahlins for the period from March 1, 1974, to December 31, 1974, with an option to renew for one year. Clause 12 of this lease, essentially similar to paragraph 6 in the prior leases, provided: "It is understood and agreed that all licenses for the property and premises hereon leased are not to be transferred or sold." Jerry Ball also was aware of Agnes Ahlin's position that the licenses were non-transferable.

Jerry Ball was unsuccessful in operating the Alpine Lounge and in 1974 sold his interest to Joe Evans for $5,000. The trial court determined that this sale also included the liquor licenses. Evans was president of Alpine Corp., the corporation formed for operation of the business. The Ahlins and Alpine Corp. entered into a new lease on December 4, 1975, and the clause regarding transferability of the licenses was changed to read as follows:

"15. ASSIGNMENT OF LICENSES DURING TERM OF LEASE. It is understood and agreed that all licenses for the property and premises herein leased are not to be transferred or sold during the term of this lease or the renewal term hereof, unless such transfer is being made in connection with the assignment of this lease with the consent of owners."

The trial court found that "[a]ccording to the evidence this clause was put into the lease to clarify the meaning of the language in the prior leases."

issued in any city; thereafter, licenses were to be issued in relation to the population of the city in a ratio of no more than one license for each 1,500 people. However, the owners of licenses issued prior to the effective date of the amendment were entitled to renew those licenses annually regardless of the population of the city for which such license was issued. 1959 Idaho Sess.Laws, ch. 118, § 1. The legislature also amended I.C. § 23–908 in 1959 to provide that licenses are transferable upon application to and approval of the director (then commissioner) of the Department of Law En-

forcement. 1959 Idaho Sess.Laws, ch. 118, § 3. Restricting the number of licenses which could be issued, and making the licenses transferable between third persons, created a valuable asset, subject to barter and sale, in the hands of persons who then possessed, or in the future would acquire, a renewable license to sell liquor by the drink. *Weller v. Hopper,* 85 Idaho 386, 379 P.2d 792 (1963); *see Schieche v. Pasco,* 88 Idaho 36, 395 P.2d 671 (1964). The dispute in this case arises over the ownership of a liquor license originally issued prior to 1959, which carries with it the right to renew.

Evans knew that the Ahlins insisted that the liquor license not be transferred to any other premises during the lease or after its termination. The Ahlins had sought legal advice (not from counsel on appeal) and were advised that the new clause prohibited transfer of the liquor license away from the premises during or after the expiration of the lease. Evans, on the other hand, was advised by his lawyer that the liquor license could be transferred by Alpine Corp. to other premises after the termination of the lease. The trial court found that "[t]he parties to the lease signed it each knowing the position of the other party, each one relying on his own lawyer's advice."

On or about November 23, 1976, Alpine Corp. sold the business to Uptick Corp., the plaintiff-appellant herein, for $40,000. The sales agreement recites that the primary assets of the business consisted of the state, city and county retail licenses for retail sale of liquor by the drink. As a part of the sale, the lease of December 4, 1975, was assigned by Alpine to Uptick.[2] The trial court found that the owners of Uptick Corp. knew the Ahlins' position regarding the non-transferability of the liquor license away from the premises at the time they purchased the business.

Plaintiff Uptick Corp., claiming that the language in the 1975 lease is controlling, sought a declaratory judgment that defendants do not have any right, title, or interest in the licenses and that plaintiff is the sole and exclusive owner of all license rights. Defendants, the Ahlins, counterclaimed for reformation of the 1975 lease.

The case was tried without a jury, and after hearing the evidence the trial court declared that the Ahlins have a "premises right" to the liquor licenses and that at the time plaintiff leaves the premises, the li-quor licenses must be transferred to the defendants. Even though the trial court found that the Ahlins were mistaken in their belief that clause 15 of the 1975 lease restricted the licenses to the Alpine Lounge premises, the court ordered reformation of the lease and a mandatory injunction to reflect its decision. Plaintiff appeals.

We will address three issues presented by this appeal: whether the Ahlins maintained or reserved in themselves any "premises interest" in the liquor licenses issued for use at the Alpine Lounge; whether the 1975 lease agreement restricted the liquor licenses to the Alpine Lounge beyond the term of the lease; and, whether the trial court was correct in reforming the 1975 lease agreement to conform to the intentions of the lessors, the Ahlins.

## I

The trial court found that defendant lessors, the Ahlins, have a so-called "premises interest" in the liquor license issued for use at the Alpine Lounge, although the court did not specifically define what the "premises interest" entails. The lower court's analysis leads us to the conclusion that the Ahlins' "premises interest" includes at least the right to restrict the license to the premises involved, and inferentially gives the Ahlins the right to renew the license if the lease expires or is terminated.[3] Whether the trial court predicated the Ahlins' "premises interest" on their status as owner-lessors of the Alpine Lounge, or on the 1959 lease which was executed by the Ahlins and Louis Echevarria, the original owner of the liquor license in question, is also unclear. The distinction, however, is unimportant because, for the reasons set forth below, we conclude that the Ahlins,

---

2. The trial court found that the Ahlins did not consent to assignment of the lease to Uptick Corp., but did consent to assignment of the lease to the owners of Uptick Corp. as named individuals. Although the Ahlins, the respondents, allege the absence of consent to the assignment to Uptick Corp. as an affirmative defense, no argument concerning the validity of assignment of the 1975 lease is raised on appeal.

3. The "premises interest" granted to the Ahlins apparently encompasses more than just the right to renew the liquor license. The trial court in effect created complete ownership rights in the license in the Ahlins by ordering that the licenses be transferred to them when the appellant leaves the Alpine Lounge premises.

lessor respondents herein, did not have any "premises interest" in the liquor license issued for use at the Alpine Lounge.[4]

■ This Court has previously held that a liquor license, as between the licensee and the state, is a mere privilege to be enjoyed while the conditions and restrictions imposed by the state are complied with. *Nampa Lodge No. 1389 B. P. O. E. v. Smylie*, 71 Idaho 212, 229 P.2d 991 (1951); *see State v. Meyers*, 85 Idaho 129, 376 P.2d 710 (1962) (beer license); *State v. Rorvick*, 76 Idaho 58, 277 P.2d 566 (1954) (beer license). A matter of legislative grace, no one has an absolute or inherent right to sell intoxicating liquor. *Crazy Horse, Inc. v. Pearce*, 98 Idaho 762, 572 P.2d 865 (1977); *State v. Calloway*, 11 Idaho 719, 84 P. 27 (1906). In its desire to regulate the trafficking of liquor within the State of Idaho and to "ensure the entire control of the sale of liquor," the legislature deemed that licenses be issued only to persons qualified under the act. I.C. § 23–901. Qualifications and restrictions on licensees are set out in I.C. § 23–910.

■ The purpose of the Retail Sale of Liquor-by-the-Drink Act, I.C. §§ 23–901 *et seq.*, is to protect the health, welfare and safety of the people of the State of Idaho and promote and encourage temperance in the use of alcoholic beverages. I.C. § 23–901; *see Adams v. Department of Law Enforcement*, 99 Idaho 255, 580 P.2d 858 (1978). A person wishing to obtain a liquor license must submit an application to the Department of Law Enforcement, setting forth the applicant's qualifications and statements and information relative to the premises where the liquor is to be sold. I.C. § 23–905. Only after investigation of the applicant and a determination that the contents of the application are true, that the

4. The trial court reviewed material portions of Title 23, chapter 9, Idaho Code, and, as a matter of law, concluded that "[t]he state seeks to license *both premises and the individual* operating the business." (Emphasis added.) We disagree with this initial conclusion. All references to the issuance of liquor licenses in I.C. § 23–901 *et seq.* are made in regard to persons. *See, e.g.*, I.C. § 23–901 (officials authorized to grant licenses to *persons*); I.C. § 23–902(c) (license issued to *qualified person*); I.C. § 23–902(d) (licensee is *person* to whom license is issued). *See also* I.C. §§ 23–908 and –910. A liquor license is issued to a person who is then restricted in the use of that license to a particular place or location approved by the director of the Department of Law Enforcement. *See, e.g.*, I.C. § 23–902(e), §§ –908 and –913. Contrary to the trial court's conclusion, no inference that the legislature intended to license premises as well as persons can be drawn from the statutory requirement that a license is issued for operation only at a particular location. Therefore, any suggestion by the trial court that the Ahlins' mere status as owner-lessors of the premises created in them an interest in the liquor license issued for use at the premises is erroneous.

The more probable basis for the trial court's conclusion that the Ahlins maintained a premises interest in the licenses used at the Alpine Lounge is the 1959 lease agreement. The trial court stated that, "It is clear that parties may contract to maintain a premises interest in a license to sell liquor by the drink," and apparently found the foundation for such contract between the Ahlins and Louis Echevarria, the original licensee, in paragraph 6 of the 1959

agreement. Paragraph 6 provides: "It is understood that the license for these premises are not to be transferred or sold to any other premises."

The evidence is undisputed that Louis Echevarria originally acquired the license used at the Alpine Lounge, and that the Ahlins have never been the record owners of the liquor license. Evidence which was objected to and contradicted at trial, the admissibility of which need not be examined, indicates that Echevarria may have intended to transfer the right to renew the licenses to the Ahlins. However, any alleged transfer of the right to renew was invalid for two reasons: first, as will be discussed in detail in the text of this opinion, *infra*, all rights in a liquor license are inseverable parts of a single legal interest which may not be transferred away at random or piecemeal; second, any attempted transfer of a liquor license or the rights thereunder could be effected only by complying with statutory procedures. I.C. § 23–908 requires that application to transfer must be made to the Department of Law Enforcement; the license must be endorsed over to the transferee by the transferor; and, the director's approval must be noted on the license. The record contains no evidence that a transfer from Echevarria to the Ahlins was accomplished in the manner and form prescribed by I.C. § 23–908, and in the absence of such a showing, any alleged transfer was ineffective. *See McBride v. Hopper*, 84 Idaho 350, 372 P.2d 401 (1962); *Greve v. Leger, Ltd.*, 64 Cal.2d 853, 415 P.2d 824 (1966).

applicant is qualified and that the premises are suitable, may the director, in his discretion, issue a license. I.C. § 23–907. This application procedure and the procedure to be followed in transferring liquor licenses, *see* I.C. § 23–908, makes it clear that the legislature painstakingly attempted to ensure that the department have complete control over who may own a liquor license, and that only persons who could be depended upon to advance the policies of the act were entitled to a license.

In *Nampa Lodge No. 1389 B. P. O. E. v. Smylie*, 71 Idaho 212, 229 P.2d 991 (1951), this Court recognized the personal nature of liquor licenses and stated that a license is a privilege personal to the licensee. *See also McBride v. Hopper*, 84 Idaho 350, 372 P.2d 401 (1962). The right to sell spirits by retail is conferred upon the director's judgment of the ability and qualifications of the applicant to faithfully discharge the duties imposed on him or her. *See generally*, 45 Am.Jur., Intoxicating Liquors § 147–152, 48 C.J.S. Intoxicating Liquors § 104–106. Finally, the personal nature of the privilege to sell liquor by the drink can most clearly be seen upon reading I.C. § 23–908, which states in pertinent part that, "[e]very license issued under the provisions of this act is separate and distinct and *no person except the licensee therein named except as herein otherwise provided shall exercise any of the privileges granted thereunder.*" (Emphasis added.) The right to renew is included among the privileges appurtenant to a liquor license and is a privilege which is to be exercised exclusively by the named licensee. To hold otherwise would enable persons who have not subjected themselves to the scrutiny and approval of the director of the Department of Law Enforcement to acquire an interest in a license and circumvent the policy of the act that only qualified

persons own licenses and exercise rights thereunder.

We find support in our conclusion from jurisdictions which have previously decided similar issues. The Arizona Supreme Court reviewed statutes kindred to our own in *Clark v. Tinnin*, 81 Ariz. 259, 304 P.2d 947 (1956). The Arizona court concluded that the statutory language "presupposes that the person making application for a liquor license will be the true owner thereof and will not, in fact, be acting for another who is 'undisclosed.'" *Id.* 304 P.2d at 949. The license in question in *Clark* was issued to the lessee of the premises. An agreement with the lessor of the premises provided that the lessor was the owner of the liquor license and prohibited the transfer of the license to another property or location without the approval of the lessor. The court held that the agreement was invalid and unenforceable. *Id.* at 950. Thus, the lessor, having failed to meet the unambiguous application requirements of the licensing statute, had acquired no rights of any kind in the license issued to the lessee.

In *Feurherm v. Schmaing*, 592 P.2d 924 (Mont.1979), the original lessor of the bar was also the original owner of the liquor licenses used in the operation of the business. The lessor assigned the license to the lessees who took over the lounge operations. Contrary to the original agreement,[5] transfers of the licenses took place from lessee to lessee. When a successor lessor requested that the liquor license be transferred to him, the successor lessees refused. On appeal, the Supreme Court of Montana reviewed the state's statutory scheme and concluded that "[i]f we were to approve the purported 'equitable ownership' of [the lessor] in the instant case, where he claims to have been the equitable owner of the

---

5. Agreements between the lessor and each lessee provided that at the commencement of the lease, the lessee would pay costs of transferring the license from lessor to lessee and, at expiration of the lease, the lessor would pay the costs of transferring the licenses back to the lessor. The lessees also agreed not to transfer the licenses to third parties during the term of the lease. Rather than following the terms of the agreement to protect his interests, the lessor had each license transferee, the lessees of the premises, sign an assignment in which the name of the successor transferee was left blank; the lessor would then simply fill in the name of each successive lessee. The lessor's name, therefore, was not involved in the subsequent transfers.

license in question for a period of . . . years without ever having made his claimed interest known to the Liquor Division of the Department of Revenue, we would be sanctioning an unlawful scheme." *Id.* at 930.

We find the analyses of the Arizona and Montana courts convincing and applicable to the case at hand. *See also Eisenman v. Seitz,* 26 Del.Ch. 185, 25 A.2d 496 (1942); *Mississippi Tax Comm'n v. Moore,* 209 So.2d 832 (Miss.1968); *Scranton v. Whitlock,* 389 P.2d 1015 (Wyo.1964). The Ahlins admittedly were never the named licensees of the licenses issued for use at the Alpine Lounge. The licenses have always been issued to the lessees of the premises, as operators of the business. *See* I.C. § 23–908. Nor could the 1959 lease agreement effectively transfer the licenses, or reserve any interest therein, to the Ahlins. The record contains no evidence that the Ahlins applied for a license or attempted to comply with statutory procedures for transfer of liquor licenses set out in I.C. § 23–908. *See* note 4, *supra.* Although the Ahlins have always asserted that they have the right to restrict the liquor license to the Alpine Lounge premises, they have never been approved as licensees or acquired any rights in the liquor licenses used at the Alpine Lounge through statutory procedures.

The trial court erred in creating the equitable right, or so-called "premises interest" in the Ahlins, in direct contravention to I.C. § 23–908 which provides that no person other than the named licensee shall be entitled to exercise any rights granted with the license. In light of I.C. § 23–908, we hold that rights under a liquor license are inseverable parts of a complete interest and that a "premises interest" may not be created in a person other than the named licensee in contravention to statutory policy.

## II

Without any "premises interest" in the liquor licenses, the only right enforceable by the Ahlins would be a contractual right. Persons may freely contract for the transfer of liquor licenses, subject, of course, to the approval of the Department of Law Enforcement. *See Weller v. Hopper,* 85 Idaho 386, 379 P.2d 792 (1963); *McBride v. Hopper,* 84 Idaho 350, 372 P.2d 401 (1962). Such contracts may be specifically enforced as the conveyance of a unique property. *Accord Pern v. Stocks,* 93 Idaho 866, 477 P.2d 108 (1970); *see Ringer v. Rice,* 97 Idaho 105, 540 P.2d 290 (1975). Thus, by carefully drawn and executed agreements, a lessor may ensure that a liquor license will not be transferred away from the leased premises, regardless of whether the liquor license was originally issued in the lessor's name. A lessor may execute an agreement with a lessee, in whose name the business will be operated and liquor license issued, which provides that at the termination or expiration of the lease the lessee will transfer or retransfer the liquor licenses to the lessor. This practice is not uncommon. An example of such an agreement was before this Court in *Bilbao v. Krettinger,* 91 Idaho 69, 415 P.2d 712 (1966).

In *Bilbao,* the lessor of the Owyhee Tavern sought to restrict the licenses originally owned by him and used in the operation of the business to the Owyhee Tavern premises. Essentially, the procedure used to accomplish this restriction was to prepare a written transfer of the license, which would be issued in the name of the lessee-operator of the tavern, and have the lessee or assignee execute the transfer concurrently with the execution of each lease agreement or assignment thereof. At the behest of the Department of Law Enforcement, which would not condone operation of the tavern and sale of liquor by a lessee who had executed an unconditional transfer of his liquor license, the lessor included the following proviso in the written transfers:

> "Provided, however, that this transfer shall not take effect until and unless the undersigned is declared to be in default by the said [lessor] under the terms of the lease." *Id.* at 71, 415 P.2d at 714.

This clause was included in all subsequent transfer agreements between the lessees or assignees and the lessor.

This procedure was followed until subsequent lessees, the defendants, sought to remove the liquor licenses to another location at the end of the lease term. The lessor brought an action to reform the transfer executed by defendants to make it conform to the agreement of the parties, that, upon termination of the lease, the liquor license should remain as an asset of the Owyhee Tavern and its owners. The trial court found that the true understanding of the parties was that the licenses would be retransferred and assigned to the lessor upon termination of the lease. The trial court reformed the transfer to reflect the true agreement that upon termination of the lease, as well as upon default, the retail liquor licenses would be retransferred and assigned to the lessor. This Court affirmed on appeal. *See also Ringer v. Rice*, 97 Idaho 105, 540 P.2d 290 (1975).

Having previously recognized the enforceability of properly drawn contracts between lessees and lessors to require the retransfer of a liquor license to a lessor of a particular premises, we must determine whether Uptick is obligated by any agreement with the Ahlins to restrict the licenses now issued in Uptick's name to the Alpine Lounge premises. Uptick Corp. is the assignee-lessee under the December 4, 1975, lease agreement between the Ahlins, as lessors, and Alpine Corp., as lessee. The 1975 lease contains the following clause:

"15. ASSIGNMENT OF LICENSES DURING TERM OF LEASE. It is understood and agreed that all licenses for the property and premises herein leased are not to be transferred or sold during the term of this lease or the renewal term hereof, unless such transfer is being made in connection with the assignment of this lease with the consent of owners."

The evidence indicates that the Ahlins believed that this clause restricted the licenses to the Alpine Lounge premises during and after the term of the lease. The trial court, however, in its Memorandum Decision, Findings of Fact, Conclusions of Law and Order, reviewed the unambiguous language of clause 15, finding that "[t]hey [the Ah-

lins] were mistaken in their belief that the desired protection was provided in the lease." The trial court concluded:

"It would appear that the Ahlins were mistaken in their legal interpretation of the lease in that they believed the wording in clause 15 meant the license could not be transferred away from the premises."

The trial court's conclusion that the 1975 lease agreement, the only contract in this record under which Uptick Corp. is obligated, did not effectively prohibit transfer of the liquor licenses away from the Alpine Lounge at the expiration of the lease term is the proper interpretation of clause 15 and is sustained.

### III

We cannot, however, uphold the trial court's decision to reform the 1975 lease to reflect the intentions of the Ahlins. Stating that the only way an equitable result could be reached was through reformation, the trial court ordered that the December 4, 1975, lease be reformed to incorporate the Ahlins' intention that the liquor licenses remain at the premises after the expiration of the lease term. Appellant Uptick Corp. challenges the reformation on two grounds: first, that any mistake regarding clause 15 was a unilateral mistake and that there is no agreement between the parties which would support reformation; and, second, that the Ahlins' mistaken belief that clause 15 of the 1975 lease protected their interests was a mistake of law for which equity affords no relief. Resolution of the first challenge is dispositive of this issue.

This Court addressed the remedy of reformation in *Collins v. Parkinson*, 96 Idaho 294, 296, 527 P.2d 1252, 1254 (1974), and stated that:

"[A] court is acting properly in reforming an instrument when it appears from the evidence . . . that the instrument does not reflect the intentions of the parties and that such failure is the product of a mutual mistake, a mistake on the part of all parties to the instrument."

*See also Ed Sparks & Sons v. Joe Campbell Constr. Co.,* 99 Idaho 139, 578 P.2d 681 (1978). Thus, whether the trial court erred in reforming the 1975 lease would depend, in part, on whether there was mutual mistake of the parties to the instrument.

As discussed in part II, *supra,* the trial court found that the Ahlins were mistaken in their belief that clause 15 of the December 4, 1975, lease restricted the liquor license to the premises beyond the period of the lease. The trial court found mistake on the part of Uptick Corp. in that "Uptick knew that it might also be mistaken in the legalities concerning the transferability of the license after expiration of the lease." The court concluded that "[t]his is close to a mutual mistake in law, *i.e.,* one party now knows there was a mistake and the other party thinks it might be mistaken. In such circumstances, equity should relieve a party who because of his mistake may suffer an unconscionable loss." We cannot agree.

Joe Evans, the president of Alpine Corp., Uptick's predecessor in interest and the original party to the 1975 lease, testified that he believed that clause 15 restricted the licenses to the premises only for the duration of the lease and any extension. The trial court found that clause 15 did not prevent transfer at the end of the lease term. *See* part II, *supra.* Thus, the mistake ascribed to Uptick Corp. by the trial court was Uptick's incorrect belief that the trial court would enforce clause 15 as it was written. Appellant Uptick Corp. asserts in its brief on appeal that "this 'bootstrap' method of finding a mistake on the part of Uptick Corp. is not sufficient to provide the mutuality of mistake which is required for reformation of a contract." We agree that the facts of this case do not constitute mutual mistake. *See Collins v. Parkinson,* 96 Idaho 294, 527 P.2d 1252 (1974) (party seeking reformation of instrument by reason of mutual mistake bears heavy burden of proof); *Metropolitan Life Ins. Co. v. McClelland,* 57 Idaho 139, 63 P.2d 657 (1936) (evidence of mutual mistake must be clear and satisfactory to justify reformation of instrument).

Furthermore, by reformation, a court is not making a new contract. *Collins v. Parkinson, supra; Green v. Beaver State Contractors, Inc.,* 93 Idaho 741, 472 P.2d 307 (1970). By reforming an instrument, the court gives effect to the contract which the parties did in fact make, but which by reason of mistake was not expressed in the writing executed by them. *Bilbao v. Krettinger,* 91 Idaho 69, 415 P.2d 712 (1966); *Exum v. Portneuf-Marsh Valley Irr. Co.,* 38 Idaho 155, 220 P. 112 (1923).

The evidence before the trial court established that each party informed the other of their respective positions regarding the transferability of the licenses. The trial court expressly found that "the parties to the lease signed it, each knowing the position of the other party, each one relying on his own lawyer's advice." The parties' interpretations of clause 15 were in direct contravention to one another, and there is no showing in the record that either party abdicated its position. The failure to reach an agreement over the effect of clause 15 is evident. Nevertheless, the trial court reformed the lease to reflect only the Ahlins' position that the licenses could not be removed from the premises after expiration of the lease.

The Ahlins contend that *Bilbao v. Krettinger,* 91 Idaho 69, 415 P.2d 712 (1966), provides direct support for upholding the reformation of the 1975 lease. However, the facts in *Bilbao* are distinguishable from the case at hand. Briefly, in *Bilbao* the agreement for the transfer of liquor licenses from the lessee back to the lessor provided that the transfer would not take effect until the lessee was declared to be in default by the lessor. The trial court reformed this provision to require transfer back to the lessor upon default *or termination* of the lease. Findings that supported the reformation included: that all prior lessees had intended to transfer, and had in fact transferred, the licenses back to the lessor whenever a lease expired; and, that it was the mutual understanding of all the parties to the agreement that upon termination of the lease the licenses would be assigned and transferred back to the lessor.

In this action, the record indicates that both Alpine Corp. and Uptick Corp., as well as other previous lessees in the chain of leasing, asserted the right to remove the licenses at the expiration of the lease term. Additionally, no mutual understanding was ever reached between the Ahlins and Alpine Corp.; the parties entered into the lease relying on their respective interpretations of clause 15 to protect their interests. *Bilbao*, therefore, is of little assistance to the Ahlins.

In the absence of both a mutual mistake which would support reformation, and an agreement between the parties to which the lease could be reformed, the court erred in reforming the 1975 lease to conform to the Ahlins' intentions that the licenses remain with the premises upon expiration of the lease.

In summary, the Ahlins, as lessors, held no "premises interest" in the liquor licenses issued for use at the Alpine Lounge which would entitle them to prevent removal of the licenses upon termination of the lease. The trial court's determination that clause 15 of the 1975 lease agreement did not restrict the liquor licenses to the premises beyond the lease term was correct. However, in the absence of mutual mistake regarding the effect of clause 15, we hold that the trial court erred in reforming the 1975 lease and requiring Uptick Corp. to transfer the liquor licenses issued in its name to the Ahlins upon expiration of the lease.

We reverse and remand to the trial court with directions that judgment be entered in favor of plaintiff appellant, Uptick Corp.

McFADDEN and SHEPARD, JJ., and McQUADE, J. pro tem., concur.

BISTLINE, Justice, concurring and dissenting.

The Court's opinion tells the trial court and the litigants that it is unclear how the trial court reached its conclusion that the Ahlins had a "premises interest" in the license hanging on their inside walls since the 1959 change in liquor law licensing. If that be so, the cause could be remanded for clarification. *Stecklein v. Montgomery*, 98 Idaho 671, 570 P.2d 1359 (1977). But, says the Court, that is unimportant, and in footnote 4, the Court explains its own rationale that *premises* are not licensed, *people* are licensed. I would imagine that persons charged and fined under I.C. §§ 23–928 and –934 might entertain a different view. *See also* I.C. §§ 23–912 and –913. For my part I have thoroughly understood that a license does issue to a person for a particular premises. Accordingly, I am not as perplexed with Judge Smith's decision as the Court makes itself out to be. Other than that, I do agree that the trial court could not properly decree that the license must be transferred to the Ahlins. At the same time I cannot believe Judge Smith was clearly erroneous, if in error at all, in concluding that the Ahlins had a protectable right in having the license remain with the premises.

It would also seem to me that the Court errs in resorting to the respective advices given to the respective parties by their respective counsel, purely self-serving declarations in anyone's ball game. What is important is the past conduct of the Ahlins and their various lessees who necessarily had to have Ahlins' consent to sell liquor by the drink on the premises. Equally important is the language of the 1975 lease provision:

"15. ASSIGNMENT OF LICENSES DURING TERM OF LEASE. It is understood and agreed that all licenses for the property and premises herein leased are not to be transferred or sold during the term of this lease or the renewal term hereof, unless such transfer is being made in connection with the assignment of this lease with the consent of Owners."

Key words therein are that the licenses "are not to be transferred," and also that the licenses "are not to be sold." A sale of a license will naturally involve a transfer (assignment) of the license to another person. Not so with a transfer. A transfer is more capable of meaning a transfer to another premises than it is of being given any other meaning. So read, the 1975 provision is hardly any different than the 1959 provision, "that the license for *these* premises are not to be transferred or sold to any

other premises." The license was in 1975, as with 1959, understood to be for Ahlins' premises—*these* premises—and precluded a transfer away to another premises. Equally clear, in both provisions, removal of the license could not be effectuated by a sale of the license. That the 1975 provision added the extra, and I think unnecessary words, "during the term of this lease or renewal term hereof," is of no moment. In both leases the provision against transfer and the like provision against sale had equal efficacy in prohibiting the sale of the license or the transfer of the license by any lessee who accepted the lease and took possession thereunder; the additional language in the 1975 lease added nothing. For certain it did not, couched in the negative or prohibitory as it was, inferentially create the right to transfer or sell the very minute after the lease term expired. To say you can't do it now does not create the right to do it later.

I have no problem in seeing that from the time the 1959 act was passed this particular licensing right became wedded to this particular premise of the Ahlins—which was not an unusual occurrence in those situations where owners of leased premises were quick to realize two things: (1) That an operator needed a premise from which to dispense hard liquor and a consenting landlord; and (2) that some given premises already adapted to and committed to a tavern or lounge business weren't worth a tinker's dam if the license went elsewhere. Such was reflected in the situation of the Ahlins and the special covenants of their consent-granting leases.

If it were necessary to find a mutual mistake, a proposition which is highly doubtful, the mutual mistake made in 1975 was a failure upon the part of both parties to realize that the courts would have trouble with language which the parties knew or should have known required that the license not be transferred to other premises, and that the lease conveyance and the granting of the required consent were a continuing and valid consideration for the express, and if not express, then implicit, agreement that the license must remain with the premises so long as the premises were available and until the Ahlins consented otherwise.

I find no substance in the Court's meanderings to the effect that it would be unlawful for the owner of a premises and an operator to have an agreement that the license remain with the premises, the inference on the Court's part being that it is, for the owner, an undisclosed "interest" in the license. In the first place, it *is* disclosed, and in the second place it does not create in the owner any interest whatever in the licensee's *operations.* Simply put, the special covenant has only one value to the owner, to wit, protecting the marketability of his property—which absent the property being used as a licensed premises may cause a drastic reduction in sale or rental value.

Insofar as the instant case is concerned, the parties should have been left by the court as it found them. If the license holder chooses to not renew the license timely, as the law requires, then *both* parties suffer a pecuniary loss. If the license holder wants to sell the license, or transfer it to another premises, he is obliged to buy out the special covenant.

But for the Court to deny the Ahlins that which they bargained for and lived with for a quarter of a century is extremely unjust.

I dissent.